# United States Court of Appeals
## For the First Circuit

No. 02-1864

LITTLE BAY LOBSTER COMPANY, INC., ET AL.,

Plaintiffs, Appellants,

v.

DONALD L. EVANS, SECRETARY OF COMMERCE,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Steven J. McAuliffe, U.S. District Judge]

Before

Boudin, Chief Judge,
Selya, Circuit Judge,
and Siler,[*] Senior Circuit Judge.

Mark A. McSally with whom Kelly, Kelleher, Reilly & Simpson was on brief for appellants.
John A. Bryson with whom Kristen L. Gustafson, Department of Justice, Kelly Johnson, Acting Assistant Attorney General, Environment and Natural Resources Division, and Charles N. Lynch, Jr., Department of Commerce, National Oceanic and Atmospheric Administration, were on brief for appellee.

December 19, 2003

---

[*]Of the Sixth Circuit, sitting by designation.

**BOUDIN, <u>Chief Judge</u>**.  This is an appeal by a lobster dealer (Little Bay Lobster Company) and several lobster boat operators based in New Hampshire from a decision of the district court sustaining new federal regulations affecting the plaintiffs. For convenience, we refer to the appellants collectively as "Little Bay" in describing the claims presented on appeal and assume familiarity with earlier decisions cited below setting forth the legal and factual background in great detail.

The federal regulations in question govern lobster catches in the so-called exclusive economic zone ("the EEZ")--an area of federal jurisdiction extending from 3 to 200 nautical miles seaward of the U.S. coastline. <u>Ace Lobster Co., Inc.</u> v. <u>Evans</u>, 165 F. Supp. 2d. 148, 152 n.3 (D.R.I. 2001).  State governments regulate the first three miles seaward of their coastline and the federal government regulates beyond that limit to the outer boundary of the zone.  <u>Id.</u>  The legal framework and regulatory history are peculiarly complicated, but only a nutshell description is needed to set the scene.

In 1976, the Magnuson-Stevens Fishery Conservation Act ("the Magnuson-Stevens Act"), 16 U.S.C. §§ 1801-1883 (2000), was adopted to conserve and manage fishery resources.  16 U.S.C. § 1801(b)(1) (2000); <u>Campanale & Sons, Inc.</u> v. <u>Evans</u>, 311 F.3d 120 (1st Cir. 2002).  Regional fishery management councils, including federal and state officials and others, were authorized to adopt

for each fishery requiring conservation a fishery management plan, 16 U.S.C. § 1801(b)(4),(5) (2000); Campanale, 311 F.3d at 111; and the statute provided for the Secretary of Commerce ("the Secretary") to adopt implementing regulations based on notice and comment rule-making if the plan was consistent with a set of "national standards" set forth in the statute. 16 U.S.C. §§ 1851(a), 1854(a)(1)(A) (2000).

East coast lobsters are such an endangered fishery, and in 1978 a group of east coast states proposed a plan for both state and federal waters. In 1983, the pertinent regional council under the Magnuson-Stevens Act--the New England Fishery Management Council ("the Council")--adopted a fishery management plan for lobsters that was later implemented by the federal National Marine Fisheries Service. Nevertheless, 10 years later a study revealed that Northeast lobsters were dangerously overfished. In December 1993 the Council circulated a draft amendment proposing that four areas be designated in the EEZ and subjecting each to different restrictions (e.g., trap limits) aimed at rebuilding stocks.

Counterpart regulations were adopted by the Secretary in the spring of 1994. 59 Fed. Reg. 26,454 (May 20, 1994) (codified at 50 C.F.R. § 649.20 (1995), subsequently repealed effective Jan. 5, 2000); 59 Fed. Reg. 31,938 (June 21, 1994) (codified at 50 C.F.R. § 649.42(b) (1995), subsequently repealed effective Jan. 5, 2000). The four new management areas included two areas in the

federal waters of the gulf of Maine: area 1 starting three miles offshore and area 3 adjacent to area 1 but lying seaward of it. 59 Fed. Reg. at 31,950-51. The line separating the two areas, sometimes called the Dick Allen line, lay about 30 miles off the coast. The restrictions on lobster traps in area 1 have been more stringent than those applying in area 3.

In the meantime, Congress in 1993 had adopted the Atlantic Coastal Fisheries Cooperative Management Act ("Atlantic Coastal Act"). 16 U.S.C. §§ 5101-5108 (2000). This statute chartered an Atlantic States Marine Fisheries Commission ("the Commission") comprising representatives of states from Maine to Florida. 16 U.S.C. § 5102(3), (13) (2000). The Commission's direct concern is with mobile Atlantic coast fisheries within state waters, but in the absence of regulations under the Magnuson-Stevens Act, the Secretary can adopt for EEZ waters a plan compatible with one adopted by the Commission for state waters. 16 U.S.C. § 5103(b)(1) (2000).

This case involves such a plan under the new statute. The new plan began life as a proposed amendment to the existing plan; but, along the way, prompted by further pessimistic studies in 1996, the federal National Marine Fisheries Service proposed that the Magnuson-Stevens Act regulations be withdrawn and that new regulations be adopted under the authority of the new statute if

-4-

and when a suitable state-waters plan was adopted by the Commission. Ace Lobster, 165 F. Supp. 2d. at 157.

During the summer of 1997, the Commission sought comments on its so-called amendment 3. This plan included among other things more stringent limits on the number of lobster traps in areas 1 and 3. In September 1997, after further public hearings, the Commission's lobster management board voted to alter amendment 3 to move the boundary line between area 1 and area 3 from 30 to 50 miles offshore. The alteration enlarged area 1, the area subject to most stringent limits, thereby disadvantaging anyone who had sought lobsters within the area lying between the old line and the one now proposed.

The Commission approved amendment 3 with the revised boundary line between areas 1 and 3 in December 1997. In March 1998, National Marine Fisheries Service issued a draft environmental impact statement ("EIS"), pursuant to the National Environmental Policy Act, 42 U.S.C. §§ 4321-4370d (2000), evaluating new alternatives for lobster regulation in federal waters; one of the alternatives was amendment 3. A number of hearings on the draft EIS were held including one in Portsmouth, New Hampshire, in May 1998, and written comments were received including one from Little Bay itself attacking the shift from the Dick Allen line.

In January 1999, a proposed federal rule was published implementing amendment 3 for federal waters, 64 Fed. Reg. 2,708 (proposed January 15, 1999), and public comments were received including several pertaining to the new line.  A final EIS was issued in May 1999, noting that amendment 3 had the most support of all the alternatives under consideration.  The final EIS included a final regulatory flexibility analysis, as required by the Regulatory Flexibility Act, 5 U.S.C. §§ 601-612 (2000), concluding that those using lobster traps would be impacted in the short-run but that the benefits of rebuilding stocks outweighed the harm.

In December 1999, the National Marine Fisheries Service issued final regulations, 64 Fed. Reg. 68,228 (Dec. 6, 1999) (codified at 50 C.F.R. Part 697) which were adopted by the Secretary pursuant to the Atlantic Coastal Act, 16 U.S.C. § 5103(b) (2000).  These regulations implemented amendment 3 for federal waters including the new stricter trap limits and the shift of the Dick Allen line.  In early January 2000, Little Bay and a number of Portsmouth, New Hampshire, lobster boat operators brought suit in the federal district court against the Secretary to challenge the new regulations.

An action of this kind, framed as a declaratory judgment proceeding, is in effect a suit for review of agency action ordinarily based on the administrative record.  See Campanale, 311 F.3d at 115; Massachusetts ex rel. Div. of Marine Fisheries v.

Daley, 170 F.3d 23, 28 (1st Cir. 1999). After extensive proceedings, the district court on May 16, 2002, granted summary judgment in favor of the Secretary, and this appeal followed. Our review of the district court decision is de novo, Massachusetts ex rel. Div. of Marine Fisheries, 170 F.3d at 28. What standard we and the district court both apply to the agency's own decisions varies with the issue. Id.

The most prominent issue on appeal concerns one of the requirements the Secretary had to meet before adopting the regulations. The Atlantic Coastal Act requires inter alia that federal regulations adapting the Commission plan for use in the federal EEZ (1) follow "consultation with the appropriate [Regional] Councils," and (2) be consistent with the national standards of the Magnuson-Stevens Act. 16 U.S.C. §5103(b)(1) (2000). Here, Little Bay claims, the failure to consult is established by our intervening decision in Campanale & Sons, Inc. v. Evans.

That case, like this one, involved amendment 3 and the December 1999 regulations implementing the plan for the EEZ, but the plaintiffs were Rhode Island fishermen concerned with the numerical limits on traps. Campanale, 311 F.3d at 115. The district court rebuffed the attacks but a divided panel of this court held that the Secretary had violated his obligation to consult with the Council. Id. at 121. The court declined to say

that the error had been harmless, ruling that this inquiry was "a factual one . . . best undertaken initially by the district court." Id. at 120 n. 13.

Campanale was decided after the district court in our own case had sustained summary judgment for the Secretary. In Campanale, the court acknowledged that the Secretary had advised the Council of the proposed trap limits through the draft EIS's alternatives and had gotten comments back from the council. The Campanale panel held this to be inadequate at least where the Secretary did not tell the Council that this was its statutory consultation opportunity. Campanale, 311 F.3d at 117-21.

Conceivably, the Secretary might have "consulted" with the Council on one issue (the line) but not another (the trap limits); but in our case, the Secretary has not sought to distinguish Campanale by arguing that consultation met the letter of the statute. Rather, he argues that the Council knew what was being proposed and that--at least as to the line shift--the surrounding circumstances show that a more formal process of consultation would not have altered the result. This is a standard harmless error argument, fully available in administrative matters. Save Our Heritage, Inc. v. FAA, 269 F.3d 49, 61-62 (1st Cir. 2001); accord Campanale, 311 F.3d at 120 n. 13.

In Campanale the court chose to leave this harmless error issue to the district court on remand but there is no need for us

to do so.  Although the harmless error inquiry is in one sense a "factual" one, it is ordinarily resolved not with new evidence but by reasoned conjecture as to what would have happened "if" a particular error had not occurred.  Here, forewarned by Campanale, Little Bay and the government have briefed the prejudice issue relying upon materials in the administrative record before us.

The principal question is whether the Secretary's decision to shift the boundary line would have been altered if he had engaged in the more formal consultation with the Council called for by Campanale.  Little Bay argues that the Council had devised the line and had expert knowledge; that such consultation would have provided Little Bay with an opportunity to appear before the Council and argue against the shift; and that the shift prejudices it by imposing more stringent regulation on a large area in which Little Bay operates.

The Secretary says that there is no proof that Little Bay will be disadvantaged by the new line, but we will assume arguendo the contrary.  There is apparently no dispute that the appellant fishermen have operated in the EEZ in areas 1 and 3 and that the shift in the area 1 boundary line seaward by a substantial amount will restrict more severely operations in the very large area transferred from area 3 to area 1.  That this will adversely impact the appellants appears a natural inference.

But this, of course, does not show prejudice of the kind that concerns us.  The Secretary knew full well that the new restrictions would cause short-term harm to fishermen--harm that would be counterbalanced in the Secretary's view by the long-term benefits to everyone of rebuilding lobster fisheries for the future.  64 Fed. Reg. 2,708, 2,712 (proposed January 15, 1999). The question is whether anything that formal consultation with the Council would have brought about would have been likely to change the Secretary's position.  And on this issue, based on the arguments presented, everything points the Secretary's way.

The overall reason for the shift of the line, needless to say, was to protect more lobsters; but this was underpinned by a fairly technical judgment by the Commission and its Lobster Management Board.  The record indicates that the new line was deemed to have a series of advantages:

●to make the boundary lines compatible with stock assessment boundaries and produce more accurate stock assessments and evaluation of each area's management measures;

●to extend the existing area 1 size limits aimed at protecting the larger, more fruitful lobsters from area 1 to area 1 lobsters that tended to breed in the nearby reaches of area 3;

●to simplify compliance by fishermen because the boundary lines would now be more consistent with the boundary lines in other fisheries.

Little Bay's brief says virtually nothing about what it might have said to the Council to counter this reasoning.  Nor does it suggest anything that the Council would have been likely to say to the Secretary that would likely have led the Secretary to alter his reliance on the Commission's judgment that the line should be moved.  Absent such specifics, there is no reason to think that consultation would have produced a different result.

This conclusion is reinforced by the fact that the Council was informally involved in the new plan and commented on it to the Secretary.[1]  Further, the Secretary held public hearings, including one in Portsmouth, New Hampshire, on the draft EIS containing the boundary shift as one option.  Little Bay itself submitted comments to the Secretary on the issue.  And there is no reason why Little Bay could not have sought to enlist the support of the Council if it thought it could gain such support.

Although the burden of proof as to prejudice lies with Little Bay, First Am. Disc. Corp. v. CFTC, 222 F.3d 1008, 1015 (D.C. Cir. 2000), the substantive standard for harmless error tends to favor the objecting party.  See, e.g., Moulton v. Rival Co., 116

---

[1]In addition to interchange of written communications, there was also a significant number of opportunities for Council members to express their views in person.  National Marine Fisheries Service representatives attend all New England Council meetings and a member of the National Marine Fisheries Service sits on the Council as a voting member.  16 § U.S.C. 1852(b)(1)(B) (2000).  New England Council members have also commonly held seats on the Atlantic Commission.

F.3d 22, 26 (1st Cir. 1997) ("highly probable that the error did not affect the outcome of the case"). Here, however, nothing suggests that the result was affected.

Little Bay's next set of arguments are directed to its claim that the Secretary failed to meet a second condition for adopting regulations under the Atlantic Coastal Act, namely, that the regulations conform to the national standards set forth in the Magnuson-Stevens Act. 16 U.S.C. § 5103(b)(1)(B) (2000). Little Bay says that the adoption of the new boundary line violates national standards 2, 4, and 8.

National standard 2 provides that a fishery management plan and regulations to implement it must, in respect of conservation and management measures, be "based upon the best scientific information available." 16 U.S.C. § 1851(a)(2) (2000). A regulation broadly defines the phrase "scientific information" to include scientific, economic and social information. 50 C.F.R. § 600.315(b)(1) (2002). Little Bay says that the Secretary failed to present "any scientific analysis or reasoning" to support the shift in the boundary line.

Little Bay concedes that there is ample support for the conclusion that lobster stocks off the Atlantic coast are in peril and that new measures are urgently needed. And it does not directly dispute that moving the line seaward will restrict lobster catches by imposing the more restrictive area 1 regime over a wider

area (indeed, its claim of prejudice rests on the inference that catches will be restricted). Nor does it say, or at least argue in any detail, that the inference is not "scientific" enough.

Rather, Little Bay argues tersely that it is the net effect that matters and the Secretary failed to consider that the expansion of area 1 would mean more lobsters caught in area 1. At first this appears to be a specious objection: expanding area 1 seaward means that trapping in what was previously part of area 3 is now occurring with more severe restrictions in the same territory now renamed area 1. But Little Bay then refers summarily to "requirements recently adopted which require a showing of historic participation in order to fish in area 3." Little Bay is referring, we take it, to 68 Fed. Reg. 14,902 (Mar. 27, 2003), limiting fishing in areas 3, 4, and 5 to those permit holders that can establish historical participation.

Conceivably the interaction of two changes could produce a net negative effect on conservation, but Little Bay offers no developed argument of such a threat here. If the implication is that the recent regulation may force some fishermen from area 3 to the richer (albeit more restricted) area 1, this sounds like an attack simply upon the "recently adopted" historical participation requirements. At best, it is an undeveloped claim that a new step--taken after the challenged regulation was adopted--undermines its rationale.

So viewed, the claim still fails. Presumptively an agency decision is reviewed on the record, Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743 (1985); Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 420 (1971); and while rare circumstances might encourage a reviewing court to look at later developments (e.g., if both proposals were developed in tandem), nothing of the kind is alleged in this case. Further, even if the "historic participation" requirement were part of the very regulations at issue, Little Bay says nothing beyond one speculative sentence to suggest a likelihood of its undermining the benefits of the new line, and that alone is fatal.

Little Bay next invokes national standard 4 which requires that any action that "allocate[s] or assign[s] fishing privileges among the various U.S. fishermen" shall meet various tests, including a requirement that it be "fair and equitable to all such fishermen." 16 U.S.C. § 1851(a)(4) (2000). The regulations say that an allocation means a "direct and deliberate distribution" of fishing privileges and not management measures that have "incidental allocative effects." 50 C.F.R. § 600.325(c)(1) (2002).

We agree with the Secretary, and the district court, that the boundary line shift is not such a direct allocation. Nothing in the shift, or the other concurrent changes, prevents fisherman from operating in areas 1 or 3 or both. To the extent that Little

Bay thinks that the "historic participation" limitations later adopted for area 3 do effect such an allocation--a matter on which we express no view--it is challenging the wrong regulation.

Little Bay's last attack is based on national standard 8 which, so far as pertinent, requires the Secretary in adopting restrictions to take account of the interests of local fishing communities and, "to the extent practicable" and consistent with conservation goals, to minimize the adverse economic impact. 16 U.S.C. § 1851(a)(8) (2000). Little Bay does not deny the draft EIS discussed various alternative conservation measures and the impacts on local communities; but it says that there was no separate assessment of the effects on its local community of moving the boundary line. This appears to be true.

Nevertheless, the required analysis of alternatives and impacts is subject to a rule of reason, for study could go on forever. See Associated Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 110-111 (1st Cir. 1997); cf. Roosevelt Campobello Int'l Park Com'n v. EPA, 684 F.2d 1041, 1047 (1st Cir. 1982). This is especially so where, as here, a plan comprises a set of new or changed restrictions designed to work as a whole; a rule that every element in such a plan be assessed separately to determine its own individual impact would be unworkable for most complex plans could be subdivided almost without end.

In this instance, the shifting of the boundary--although quite likely to have some economic impact on some fishermen--was peculiarly hard to quantify: the impact depends <u>both</u> on the interaction of the boundary shift with other regulatory measures (<u>e.g.</u>, changes in trap limits) and on the differing fishing strategies (choice of area, number of traps) that different fishermen may choose to adopt in response to the new changes--strategies that may alter over time and are not within the Secretary's control. <u>See</u> 64 Fed. Reg. 68,228, 68,235-36 (Dec. 6, 1999).

There is no mechanical way to say when enough is enough. About the best a court can do is to ask whether the Secretary has examined the impacts of, and alternatives to, the plan he ultimately adopts and whether a challenged failure to carry the analysis further is clearly unreasonable, taking account of the usual considerations (<u>e.g.</u>, whether information is available and whether the further analysis is likely to be determinative). In this gray area, some burden lies on the contestant to show why a particular gap or omission is unreasonable.

Here the basic obligation to assess the impacts of, and alternatives to, the adopted plan as a whole was achieved. The feasibility of fruitfully analyzing the boundary shift in isolation is unclear; and given the independent technical reasons for the shift, it appears to follow naturally from the decision to adopt

-16-

the new management area scheme--a choice that was the subject of full scale study. Accordingly, there was no failure to meet national standard 8.

This discussion of national standard 8 also disposes, in substance, of the final objection offered by Little Bay based on a quite different statute: the Regulatory Flexibility Act, 5 U.S.C. §§ 601-612 (2000). This statute does not alter the substantive mission of the agencies under their own statutes; rather, the Act creates procedural obligations to assure that the special concerns of small entities are given attention in the comment and analysis process when the agency undertakes rule-makings that affect small entities. Associated Fisheries of Me., 127 F.3d at 116.

The regime at issue in this case unquestionably affects a substantial number of small businesses; most, if not all, of the affected fishing is done by such entities. Therefore, as required by the statute, 5 U.S.C. § 603(a) (2000), the Service prepared an initial regulatory flexibility analysis as to the impact on small entities in conjunction with the proposal for rule-making; and, when it adopted the final regime, it included a final statement addressed to the subject. 5 U.S.C. § 604(a) (2000). This much is common ground.

The statute also specifies what the final statement must cover, and in compliance with its terms the final statement in this case described the range of small businesses affected and the

estimated magnitude of the effects, summarized comments on the proposed rule and the response of the agency to the comments, addressed record-keeping burdens incident to the new regime, and discussed the reasons for the regime adopted and the reasons for preferring it to other alternatives. 5 U.S.C. § 604(a) (2000); see Associated Fisheries of Me., 127 F.3d at 116.

In a short final section of its brief, Little Bay offers several different criticisms of the agency's compliance, but the core of the main argument is this: that the agency gave very little separate attention to comments regarding the change in the boundary line and, above all, "[n]o analysis was conducted to determine whether an alternative boundary line would have minimized the economic impact upon the [a]ppellants or others similarly situated."

Admittedly the final statement did little more than acknowledge that "several commentators" had objected to the change in the boundary line and responded by referring to the "current consensus" in support of the new regime as a whole, 64 Fed. Reg. at 68,235; and the agency certainly did not separately analyze the new regime by comparing as two separate alternatives the new regime with the boundary shift and without it. The question is whether the Regulatory Flexibility Act required more and we conclude, in the context of this case, that it did not.

The agency's final statement adopting the new regime, together with materials cross-referenced in it, set forth in detail the reasons for adopting the new regime as a whole and the reasons for preferring it to a series of alternatives.  This is what the statute requires where it applies.  But, just as was true with national standard 8, there is no requirement as to the amount of detail with which specific comments need to be discussed and certainly no obligation to treat every element of a plan as a separate alternative.

Here, as with national standard 8, a rule of reason applies.  See Associated Fisheries of Me., 127 F.3d at 116.[2] The agency's obligation is simply to make a reasonable good faith effort to address comments and alternatives.  Id.; accord Alenco Communications, Inc. v. FCC, 201 F.3d 608, 625 (5th Cir. 2000). And, where the agency has addressed a range of comments and considered a set of alternatives to the proposal adopted, the burden is upon the critic to show why a brief response on one set of comments or the failure to analyze one element as a separate alternative condemns the effort.

In this case, we have assumed for the purpose of standing, if nothing else, that the boundary shift probably has

---

[2]Although our discussion in Associated Fisheries of Maine, Inc., focused on the Regulatory Flexibility Act as it stood before several amendments regarding judicial review under the Act, nothing in those amendments has changed our approach here.

some impact on the appellants; but Little Bay has not pointed to any facts as to show a dramatic impact of the boundary line shift or any facts that undermine the original reasons proffered for the shift or any other reason why the response was inadequate or the boundary line shift required consideration as a separate alternative. Absent some discussion of such considerations, we can hardly hold the agency acted unreasonably or in bad faith by proceeding as it did.

In the same section of the brief, Little Bay says that the district judge was mistaken in expressing doubts whether the Regulatory Flexibility statute applied at all in this case. The district court did say that because small businesses are the main subject of the new regime, there was little chance that the agency analysis would overlook small businesses. But as neither he nor we have rested on such a theory to avoid application of the statute, it is beside the point on this appeal.

Affirmed.