**REVISED January 26, 2017**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

January 17, 2017

Lyle W. Cayce
Clerk

—————

No. 16-30137

—————

COASTAL CONSERVATION ASSOCIATION; CHARLES A. CAPLINGER, IV; ADAM GUILLORY; GEORGE A. HUYE,

     Plaintiffs - Appellants

v.

UNITED STATES DEPARTMENT OF COMMERCE, Penny S. Pritzker, Secretary; NATIONAL OCEANIC AND ATMOSPHERIC ADMINISTRATION, Eileen Sobeck, Assistant Administrator; NATIONAL MARINE FISHERIES SERVICE, Eileen Sobeck, Assistant Administrator,

     Defendants - Appellees

v.

CHARTER FISHERMAN'S ASSOCIATION,

     Intervenor - Appellee

—————————

Appeal from the United States District Court
for the Eastern District of Louisiana

—————————

Before STEWART, Chief Judge, SMITH and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:

     Several private anglers and the Coastal Conservation Association, a group representing private anglers (collectively, CCA), appeal the district

court's summary judgment dismissal of their lawsuit, which challenged Amendment 40 to the Reef Fish Fishery Management Plan and the Final Rule implementing that amendment. Because we find that Amendment 40 is consistent with its organic statute and was properly devised and implemented, we AFFIRM the judgment of the district court.

I

This dispute centers on the management of the red snapper fishery in the Gulf of Mexico. This fishery is regulated pursuant to the Magnuson-Stevens Act, 16 U.S.C. § 1801 *et seq.* (the MSA or the Act). The MSA was passed by Congress in 1976 in order to "take immediate action to conserve and manage the fishery resources found off the coasts of the United States" and "promote domestic commercial and recreational fishing under sound conservation and management principles." *Id.* at § 1801(b)(1), (3). To accomplish these goals, the MSA established eight Regional Fishery Management Councils, each tasked with preparing fishery management plans (FMPs) to address conservation and management of fisheries under their control. The Councils are empowered to draft FMPs that are "necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery." *Id.* at § 1853(a)(1)(A).

The Gulf Council is one such regional council, with authority to manage fisheries in the federal waters of the Gulf of Mexico off the coasts of Texas, Louisiana, Mississippi, Alabama, and Florida. The Act requires the Councils to form their fishery management plans through a process of notice-and-comment rulemaking. FMPs are proposed by the Regional Councils, with final regulations promulgated by the Secretary of Commerce through the National Marine Fishery Service (NMFS). Once the Secretary, through the NMFS,

reviews the plans and publishes the final regulations in the Federal Register, they have the full force of law. *Id.* at § 1854.

Every FMP must be consistent with ten National Standards, codified at 16 U.S.C. § 1851(a). Two of these standards are relevant to the instant litigation:

> (2)  Conservation and management measures shall be based upon the best scientific information available.
>
> (8)  Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet the requirements of paragraph (2), in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

*Id.* at § 1851(a).

In addition to the National Standards, the management of Gulf of Mexico red snapper is addressed specifically in Section 407 of the Act. Section 407, which was added to the Act in 1996, requires that any FMP for the red snapper fishery adopted by the Gulf Council must "establish separate quotas for recreational fishing (which, for the purposes of this subsection shall include charter fishing [i.e., fishing from chartered vessels]) and commercial fishing that, when reached, result in a prohibition on the retention of fish caught during recreational fishing and commercial fishing, respectively, for the remainder of the fishing year." *Id.* at § 1883(d)(1).

Red snapper stock is managed under the Reef Fish FMP, first implemented by the Secretary in 1984. In 1990, in response to observed declines in the adult population of red snapper, the Council implemented Amendment 1 to the Reef Fish FMP with the goal of rebuilding the adult red

3

snapper population by 2000.[1]  The Gulf Council manages the recreational sector using several imprecise measures, including length of season.  *Guindon v. Pritzker*, 31 F. Supp. 3d 169, 178 (D.D.C. 2014).  The recreational sector exceeded its quota in every year from 1991-2005, from 2007-2009, and from 2011-2013.[2]  The Gulf Council has largely responded to these violations by shortening the fishing season.  79 Fed. Reg. 27,768, 27,768-69 (May 15, 2014) (Emergency Rule To Revise the Recreational Accountability Measures and Revise the 2014 Recreational Fishing Season for Red Snapper in the Gulf of Mexico).  The season in 2014 was only nine days long.  *Id.* at 27,770.

NMFS is responsible for ensuring that the entire recreational Gulf harvest does not exceed the recreational quota, taking into account harvest in both federal and state waters.  *See* 50 C.F.R. § 622.8(a).  While the Gulf Council has shortened the fishing season in federal waters, the Gulf states have responded by loosening restrictions in state waters:  in 2014, while the season in federal waters was nine days long, Mississippi and Alabama waters were open for 21 days, Florida for 52 days, Louisiana for 286 days, and Texas for 365 days.  Only private anglers with boats can take advantage of the state seasons; federal regulations require federally permitted charter boats to comply with the federal regulations, which "are more restrictive than state regulations . . . regardless of where the fish are harvested."  50 C.F.R. § 622.20(a)(1).  And while there has been a moratorium on the issuance of new charter vessel permits for Gulf reef fish since 2003, "there is no limit to the number of anglers fishing from private recreational vessels that target reef fish species." 80 Fed. Reg. 3541, 3,542 (January 23, 2015) (Notice of Proposed Amendment 40).

---

[1] This target date was ultimately extended to 2032.  *Coastal Conservation Ass'n v. Gutierrez*, 512 F. Supp. 2d 896, 899 (S.D. Tex. 2007).

[2] The Charter Fisherman's Association notes in its brief that "2006 and 2010 were unusual years, because 2006 followed Hurricanes Katrina and Rita and 2010 was the year of the Deepwater Horizon oil spill."

In 2013, the Gulf Council and NMFS proposed Amendment 40 as a means to address problems that had arisen with the red snapper fishery. In the notice of proposed rulemaking, the Secretary explained, "Establishing separate components [for charter and private anglers] is . . . intended to provide a basis for flexible management that can be tailored to the needs of each component, thereby reducing the likelihood for recreational quota overruns which could negatively impact the rebuilding of the red snapper stock." *Id.* The Secretary also described how the privileged position of private anglers—in particular, the access to state waters during state seasons and the lack of a limit on private vessels targeting red snapper—had adversely affected the charter industry, explaining that "[b]y establishing separate sectors, NMFS intends to stabilize the Federal for-hire component's participation in the sector." *Id.*

The Final Rule, issued in 2015, contains measures to establish two components within the recreational sector for Gulf of Mexico red snapper: a federal charter component and a private angling component. 80 Fed. Reg. 22,422 (April 22, 2015) (Final Rule Implementing Amendment 40). The Final Rule allocates the red snapper recreational quota between these two components and establishes separate red snapper season closure provisions for the two components. *Id.* Each component's season will begin on June 1 and the season length will be projected from each component's annual catch target. *Id.* at 22,423. The separate component quotas and associated management measures are only effective for the 2015, 2016, and 2017 fishing years, after which they sunset unless the Gulf Council takes further action. *Id.* The Final Rule reiterated NMFS's finding that Amendment 40 will provide a basis for increased flexibility in future management of the recreational sector, and reduce the likelihood of recreational quota overruns, which could negatively impact the rebuilding of the red snapper stock. *Id.* at 22,422.

The CCA filed this action against the Secretary of Commerce, the Director of NOAA, and the Director of NMFS (collectively, the Secretary) challenging Amendment 40 and the Final Rule in late April, 2015. The Charter Fisherman's Association (the CFA), which represents charter fishing businesses, intervened as a defendant. The parties filed cross-motions for summary judgment; on January 5, 2016, the district court granted the defendants' and intervenor-defendants' motions. This appeal followed.

## II

We review a grant of summary judgment de novo, applying the same standard as the district court. *Louisiana Crawfish Producers Ass'n-W. v. Rowan*, 463 F.3d 352, 355 (5th Cir. 2006). On appeal, the CCA argues that: (1) the MSA prohibits the Gulf Council from regulating charter fishing separately from other recreational fishermen; (2) the Gulf Council and the NMFS failed to adequately "assess, specify, and analyze" the likely economic and social effects of Amendment 40; and (3) the selection of data ranges used to calculate quota allocations was arbitrary and capricious. We address each argument in turn.

### A. Subquotas within the Recreational Sector

In reviewing an agency's construction of a statute that it is tasked with administering, this court follows the two-step framework set out by the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). "First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. The agency's view "governs

6

if it is a reasonable interpretation of the statute—not necessarily the only possible interpretation, nor even the interpretation deemed *most* reasonable by the courts." *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009) (emphasis in original).

The CCA argues that Amendment 40's establishment of two components within the recreational sector for Gulf of Mexico red snapper—a federal charter component and private angling component—conflicts with the unambiguously expressed intent of Congress in adopting Section 407. Specifically, the CCA argues that "[t]he words of 16 U.S.C. § 1883(d) on their face prohibit a separate charter fishing quota," and that "[t]he plain meaning of 16 U.S.C. § 1883(d) is also shown by two canons of statutory interpretation." We find neither of these arguments persuasive.

As to the former, the CCA begins from a false premise: Amendment 40 does not in fact create a "separate" charter fishing quota. Rather, it creates a *sub*-quota for charter fishing within the recreational sector. *See* 80 Fed. Reg. 22,422, 22,422 ("This final rule contains measures to establish two components *within the recreational sector* for Gulf of Mexico . . . red snapper (a Federal charter vessel/headboat (for-hire) component and private angling component)." (emphasis added)). This is not a mere semantic distinction: Amendment 40 requires that all recreational landing—whether by private or charter anglers— cease when the total sector quota of 5.390 million pounds is reached. *See* 80 Fed. Reg. 22,422, 22,430. There is no language within Section 407 that prohibits the subdivision of the recreational or commercial fishing quotas. *See* 16 U.S.C. § 1883(d)(1).

The CCA's argument that two canons of statutory interpretation demonstrate that Section 407 prohibits the establishment of sub-quotas is equally unconvincing. First, the CCA argues that the canon of *expressio unius est exclusio alterius* militates in favor of its position. This canon holds that

"expressing one item of a commonly associated group or series excludes another left unmentioned." *United States v. Vonn*, 535 U.S. 55, 65 (2002). The CCA argues that this canon supports its argument because "Congress' mandate in 16 U.S.C. § 1883(d) for two quotas prohibits NMFS from creating a third quota," and "Congress' mandate that the recreational fishing quota 'shall include charter fishing' implies exclusion of authority to create a separate charter fishing quota." However, as previously discussed, Amendment 40 does not create a separate quota for charter fishing; the sub-quotas for private and charter anglers are included within the recreational fishing quota. 80 Fed. Reg. 22,422, 22,430. And the *exclusio unius* canon cannot be used to read Section 407 as prohibiting the creation of sub-quotas. As the Supreme Court has explained, the canon does not apply "unless it is fair to suppose that Congress considered the unnamed possibility and meant to say no to it." *Marx v. Gen. Revenue Corp.*, 133 S. Ct. 1166, 1175 (2013) (quoting *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 169 (2003)). Nothing in the text or the legislative history of Section 407 suggests that it would be fair to suppose that Congress considered the possibility that the Gulf Council would opt to subdivide the recreational sector and meant to prohibit it from doing so. *See* 16 U.S.C. § 1883(d)(1); S. Rep. No. 104-276, 104th Cong., 2nd Sess. (May 23, 1996).

The CCA next argues that the canon that a specific statute prevails over an inconsistent general statute supports its position. "The general/specific canon is perhaps most frequently applied to statutes in which a general permission or prohibition is contradicted by a specific prohibition or permission. To eliminate the contradiction, the specific provision is construed as an exception to the general one." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 132 S. Ct. 2065, 2071 (2012). The CCA argues that, because the specific language of Section 407 "conflicts" with the general

authorization in 16 U.S.C. § 1853(b)(3)(A) for NMFS to establish regulatory quotas for fishery sectors, the later-enacted, specific language should apply. However, we perceive no conflict between the two provisions. In promulgating Amendment 40, the Secretary heeded Section 407's instruction and "establish[ed] separate quotas for recreational fishing (which, for the purposes of this subsection shall include charter fishing) and commercial fishing." 16 U.S.C. § 1883(d)(1). The fact that charter fishing is included within the recreational fishing sector as one of two distinct components is immaterial.

The CCA does not challenge the district court's finding that, viewing Section 407 as ambiguous on the issue of sub-quotas, the interpretation of Section 407(d) to allow sub-quotas is permissible under step two of *Chevron*. Nor does the CCA challenge the district court's finding that the Secretary had a "rational basis for [its] decision to subdivide the recreational quota." Those challenges are therefore forfeited. *See Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) ("An appellant abandons all issues not raised and argued in its initial brief on appeal.").

Amendment 40 does not create a separate quota for charter fishing; it subdivides the recreational sector into private and charter components. The directive to "establish separate quotas for recreational fishing (which, for the purposes of this subsection shall include charter fishing) and commercial fishing" does not unambiguously prohibit the Secretary from creating sub-quotas within the recreational sector. Even assuming, arguendo, that a prohibition on sub-quotas is a reasonable interpretation of the section, it could not be said that "Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842. Because Section 407 does not clearly prohibit the creation of sub-quotas, we affirm the district court's grant of summary judgment to the Secretary on this issue.

## B. Economic and Social Impact Analysis

In reviewing an FMP or an amendment to an FMP, this court's task "is not to review *de novo* whether the amendment complies with [the ten National Standards] but to determine whether the Secretary's conclusion that the standards have been satisfied is rational and supported by the record." *C & W Fish Co. v. Fox*, 931 F.2d 1556, 1562 (D.C. Cir. 1991); *see also Alaska Factory Trawler Ass'n v. Baldridge*, 831 F.2d 1456, 1460 (9th Cir. 1987); *Maine v. Kreps*, 563 F.2d 1043, 1050-51 (1st Cir. 1977). However, when a challenge to an FMP is based on the Secretary's interpretation of the MSA, we apply the *Chevron* analysis. 467 U.S. at 843. The CCA argues that the Secretary failed to perform her duties under National Standards 8 and 2 to use the best available economic and social data to minimize adverse economic impacts of Amendment 40 and under 16 U.S.C. § 1853(a)(9) to assess, specify, and analyze the economic and social impacts of Amendment 40 and to include these findings in a Fishery Impact Statement (FIS).

No federal appellate court has yet interpreted the requirements of § 1853(a)(9). However, the two district courts that have considered challenges brought under § 1853(a)(9) agree that "[t]he FIS requirement is . . . procedural, not substantive," and that it is satisfied where NMFS produces the required assessments, without respect to their conclusions. *City of New Bedford v. Locke*, No. CIV.A. 10-10789-RWZ, 2011 WL 2636863, at *6 (D. Mass. June 30, 2011), *aff'd sub nom. Lovgren v. Locke*, 701 F.3d 5 (1st Cir. 2012); *accord Coastal Conservation Ass'n v. Blank*, No. 2:09-CV-641-FTM-29, 2011 WL 4530544, at *7 (M.D. Fla. Sept. 29, 2011) ("The issue before the Court in the Section 1853(a)(9) challenge . . . is not whether the conclusions on how [the proposed FMP amendment] will likely affect the recreational fishing sector are correct. Rather, the issue is whether the [NMFS] arrived at the answer only after complying with the obligation to assess, specify, and analyze how [the

amendment] would likely affect the recreational fishing sector."). We agree with this interpretation of § 1853(a)(9).

National Standard 8 requires the NMFS to "take into account the importance of fishery resources to fishing communities by utilizing economic and social data." 16 U.S.C. § 1851(a)(8). The First Circuit has noted that "the required analysis of alternatives and impacts is subject to a rule of reason, for study could go on forever." *Little Bay Lobster Co. v. Evans*, 352 F.3d 462, 470 (1st Cir. 2003). "About the best a court can do is to ask whether the Secretary has examined the impacts of, and alternatives to, the plan [s]he ultimately adopts and whether a challenged failure to carry the analysis further is clearly unreasonable, taking account of the usual considerations (e.g., whether information is available and whether the further analysis is likely to be determinative)." *Id.* In addition, the First Circuit has observed that "[t]he plain language of [National Standard] 8 and its advisory guidelines make clear that these obligations are subordinate to the MSA's overarching conservation goals." *Lovgren*, 701 F.3d at 35. Indeed, the guidelines specifically state, "Deliberations regarding the importance of fishery resources to affected fishing communities . . . must not compromise the achievement of conservation requirements and goals of the FMP." 50 C.F.R. § 600.345(b)(1).

National Standard 2 states that "conservation and management measures shall be based upon the best scientific information available." 16 U.S.C. § 1851(a)(2). According to the advisory guidelines, "best scientific information" under National Standard 2 "includes, but is not limited to, information of a biological, ecological, economic, or social nature." 50 C.F.R. § 600.315(b)(1). However, "[t]he fact that scientific information concerning a fishery is incomplete does not prevent the preparation and implementation of an FMP." *Id.* at § 600.315(e)(2). Our sister circuits have given great latitude to the Secretary in determining what is the best information available. *See*

*Gen. Category Scallop Fishermen v. Sec'y, U.S. Dep't of Commerce*, 635 F.3d 106, 115 (3d Cir. 2011); *Washington Crab Producers, Inc. v. Mosbacher*, 924 F.2d 1438, 1448-1449 (9th Cir. 1990).

The CCA first asserts that 16 U.S.C. § 1853(a)(9) and National Standard 8 impose an affirmative duty to collect and generate only quantitative, rather than qualitative, predictions of economic and social effects. In support it points to Merriam-Webster's definition of data as "factual information (as measurements or statistics)" and argues that "it is clear that Amendment 40 and the documents supporting it did not contain a single piece of economic or social 'data'" so defined.

The CCA cites no law that supports its interpretation of § 1853(a)(9) and National Standard 8. It is not at all clear that Congress intended to limit the analysis of economic and social impacts to quantitative data, and it is evident that the Secretary has long interpreted "data" in National Standard 8 to mean both qualitative and quantitative data. The advisory guidelines are unambiguous on this point: "Qualitative and quantitative data may be used, including information provided by fishermen, dealers, processors, and fisheries organizations and associations." 50 C.F.R. § 600.345(c)(2). The Secretary's interpretation of "data" is reasonable. *See Chevron*, 467 U.S. at 843. Indeed, in *ConocoPhillips Co. v. United States Environmental Protection Agency*, 612 F.3d 822, 841 (5th Cir. 2010), we upheld the EPA's reliance on qualitative data against a similar challenge.

The CCA next argues that the Secretary should have acquired or produced quantitative data. This argument is also unpersuasive. National Standard 2 states that "conservation and management measures shall be based upon the best scientific information *available*." *Id.* at § 1851(a)(2) (emphasis added). The Secretary stated in the preamble to the Final Rule that the additional quantitative economic analysis that the CCA demanded was not

"available" within the meaning of National Standard 2. 80 Fed. Reg. 22,422, 22,426. As the Secretary explained in the FIS and in her brief on appeal:

> [T]he economic impacts of Amendment 40 on private-vessel anglers depends on such difficult-to-predict factors as how the Gulf States will choose to regulate the red snapper harvest in their waters, as well as the decisions of private-vessel anglers regarding whether to fish in State waters for red snapper or in State or federal waters for other fish species once the red snapper quota for the private-vessel component is met.

The National Standards do not require analysis of unpredictable, and thus unavailable, data. *See Little Bay Lobster*, 352 F.3d at 470. Significantly, the CCA does not identify any available information that the Secretary ignored. As several of our sister circuits have held, "[i]f no one proposed anything better, then what is available is the best." *Massachusetts ex rel. Div. of Marine Fisheries v. Daley*, 170 F.3d 23, 30 (1st Cir. 1999); *see also Nw. Envt'l Def. Ctr. v. Brennen*, 958 F.2d 930, 936 (9th Cir. 1992) (rejecting a "best scientific information available" claim because the challenger "has not pointed to any scientific evidence inconsistent with the Secretary's decision"); *Midwater Trawlers Coop. v. Dep't of Commerce*, 393 F.3d 994, 1004 (9th Cir. 2004) (affirming regulation based on best scientific evidence available when "no new information" contradicted the agency's data).

Nor is the Secretary required to "acquire or produce" the CCA's preferred quantitative data. As previously discussed, the advisory guidelines specify that "[t]he fact that scientific information concerning a fishery is incomplete does not prevent the preparation and implementation of an FMP." 50 C.F.R. § 600.315(e)(2). The Act does not unambiguously require the Secretary to produce quantitative data, and we view her interpretation of the statute's requirements as reasonable. *See Chevron*, 467 U.S. at 843. It follows from this reasonable interpretation that the Secretary is not obligated to produce further data when she possesses some, albeit incomplete, scientific information. *See,*

13

*e.g.*, *Ecology Ctr., Inc. v. U.S. Forest Serv.*, 451 F.3d 1183, 1194 n.4 (10th Cir. 2006) (citing *Recreational Fishing Alliance v. Evans*, 172 F.Supp.2d 35, 44 (D.D.C. 2001)) ("An agency is not required to collect additional evidence under the Magnuson-Stevens Fishery Conservation and Management Act."); *Washington Crab Producers, Inc. v. Mosbacher*, 924 F.2d 1438, 1448-1449 (9th Cir. 1990) ("[t]here simply is no requirement that the Secretary do what the appellants insist" when it comes to developing and analyzing the effects of an FMP).

Furthermore, the FIS prepared by the Gulf Council was based on significant background data, both quantitative and qualitative. The quantitative data includes, for example, a ranking of communities based upon the number of charter permits and charter permits divided by population; species-specific harvest data for headboats (boats renting individual seats to recreational anglers), linked to specific communities through the homeport identified for each vessel; a ranking of communities based on the number of federal for-hire permits; estimates of the number of red snapper target trips for shore, charter, and private/rental boat anglers; and estimates of the average red snapper target effort and the associated business activity.

After considering this data, the Council gave its analysis of the conservation, economic, and social impacts of the Amendment and its alternatives. Discussing the social effects of the establishment of private and charter components within the recreational section, the Council concluded:

> Indirect social benefits for the private angling component would be expected to result from management measures accounting for their specific needs and characteristics, including regional preferences for access to fishing opportunities. For the federal for-hire component, indirect social benefits would primarily result from mitigating the trend of decreasing access to red snapper by the federal for-hire component. For-hire operators, their angler passengers, and the communities where these vessels are

homeported would then be expected to benefit as a result of increased stability of access to red snapper.

With respect to the economic effects of the subdivision, the Council noted that the change "could potentially result in a more predictable season length, better business planning, and improvements to the economic performance of for-hire businesses," while admitting that "the establishment of separate components and allocations to each component would limit the private angling component to harvesting the proportion of the recreational red snapper quota allocated to them."

Although the Council's analysis does not offer quantitative predictions of the effects that Amendment 40 might have on the fishing community, the Council used the best available data to reasonably "assess, specify, and analyze" the likely economic and social effects of Amendment 40. 16 U.S.C. §§ 1851(a)(2), 1851(a)(8), 1853(a)(9). We therefore conclude that the "basic obligation to assess the impacts of, and alternatives to, the adopted plan as a whole was achieved." *See Little Bay Lobster Co.*, 352 F.3d at 470.

## *C. Allocations*

Finally, the CCA argues that the Secretary's decision to base allocations on the average of two sets of catch data, one covering 2006-2013 and one covering 1986-2013, was arbitrary and capricious. We may set aside an agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Buffalo Marine Services, Inc.*, 663 F.3d at 753. "Under this highly deferential standard of review, a reviewing court has the least latitude in finding grounds for reversal." *Louisiana Crawfish Producers*, 463 F.3d at 355 (quoting *Sabine River Auth.*, 951 F.2d at 678). When determining whether an agency action was arbitrary or capricious, our task "is to ensure that the agency 'considered the relevant factors and articulated a rational connection between the facts found and the

15

choice made.'" *Sierra Club v. U.S. Fish & Wildlife Serv.*, 245 F.3d 434, 444 (5th Cir. 2001) (quoting *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 105 (1983)).

Amendment 40 established the allocation between the federal charter and private angling components. The Secretary determined that a fair and equitable allocation between the charter and private-vessel components would result from using both historic harvest information, spanning the period from 1986 to 2013, as well as more recent harvest information. 80 Fed. Reg. 22,422, 22,429. The CCA argues that "[t]here is simply no rational basis for relying on 1986 data to make a resource allocation decision for 2015-2017," and that the use of catch history dating back to 1986 did not capture the "dramatic shift of recreational fishing away from charter boats and toward private angling," which it deems the "most dominant" change in the fishery.

Before coming to its decision, the Council considered eight alternative sets of harvest data, covering different spans of time. These alternatives were discussed at length in the FIS, as well as in the preamble to the proposed rule. *See* 80 Fed. Reg. 3,541, 3,543. The Secretary explained:

> The Council selected the alternative that combined the longest time period of available landings (1986-2013) with landings from a more recent range of years (2006-2013). Averages from each of the two time periods were then equally weighted to determine the allocation. The Council selected this allocation because it reflects both historical changes in the recreational sector as well as current conditions. It is also an approach used by the Council in setting allocations for other species (e.g., the jurisdictional apportionment of black grouper and yellowtail snapper resources between the Gulf and South Atlantic Councils).

*Id.* In the FIS, the Gulf Council explained these "historical changes," which include the shortening of the fishing season in federal waters, restricting the ability of charter anglers to fish, and the loosening of restrictions in state waters, increasing the ability of private anglers to fish. The Council described

16

how the changes affected the more recent landing data. The Council justified the selection of the mixed data set by explaining that it would "balance the history of the recreational sector with more current conditions."

The record demonstrates that the Secretary considered the relevant factors and provided a rational justification for her decision to include older data in making its allocations. As a result, we find the CCA has failed to carry its burden to show that this decision was arbitrary and capricious. *See Sierra Club*, 245 F.3d at 444.

IV

For the foregoing reasons, we AFFIRM the judgment of the district court.