PRECEDENTIAL


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 10-2341
_____

GENERAL CATEGORY SCALLOP FISHERMEN,
Appellant
v.

SECRETARY, UNITED STATES DEPARTMENT OF
COMMERCE; THE NATIONAL OCEANIC AND
ATMOSPHERIC ADMINISTRATION;
THE NATIONAL MARINE FISHERIES SERVICE
_____

On Appeal from the United States District Court
for the District of New Jersey
District Court  No. 3-08-cv-02264
District Judge: The Honorable Mary L. Cooper


Argued: January 27, 2011


Before: McKEE, *Chief Judge*, SMITH, Circuit Judge,
and STEARNS, *District Judge**

(Filed: March 16, 2011)

_____

* The Honorable Richard G. Stearns, United States
District Judge for the United States District Court of
Massachusetts, sitting by designation.

1

Patrick F. Flanigan, Esq. (Argued)
P.O. Box 42
Swarthmore, PA 19081
        *Attorney for Plaintiff-Appellant*

Thekla Hansen-Young, Esq. (Argued)
United States Department of Justice
Environment & Natural Resources Division
P.O. Box 23795
L'Enfant Plaza Station
Washington, D.C.  20026-000
        *Attorney for Defendant-Appellee*

OPINION

STEARNS, *District Judge.*

This appeal arises from a dispute over the right of fishermen to access the Atlantic Sea Scallop Fishery.  At issue is an order of the United States District Court for the District of New Jersey denying summary judgment on all claims by Appellants,  who are former general category scallop permit holders, while granting summary judgment on all claims to Appellees Gary Locke, in his capacity as Secretary of the United States Department of Commerce, National Oceanic and Atmospheric Administration

2

(NOAA), and National Marine Fisheries Service (NMFS). We are asked to resolve: (1) whether NMFS complied with the Administrative Procedures Act (APA), 5 U.S.C. §§ 701-706, and the Magnuson-Stevens Fishery Conservation and Management Act of 1976 (Magnuson-Stevens Act), 16 U.S.C. §§ 1801-1883, when it promulgated regulations implementing Amendment 11 to the Atlantic Sea Scallop Fishery Management Plan, including a "control date" that effectively terminated the access rights of general scallop fishermen who were not established in the fishery prior to November 1, 2004; (2) whether the process by which Amendment 11 was adopted complied with the Magnuson-Stevens Act requirement that public hearings be held in "appropriate locations in the geographical area" that will be affected by changes to a Fishery Management Plan (FMP); (3) whether NMFS reasonably concluded that Amendment 11's reliance on NMFS internal dataset to determine permit eligibility complied with the Magnuson-Stevens Act's National Standard 2, which requires the use of the "best scientific information available"; and (4) whether NMFS

3

reasonably concluded that Amendment 11's limitations on the general category scallop fishery were consistent with the Magnuson-Stevens Act's National Standard 5, which prohibits the implementation of any fishery management measure that has "economic allocation as its sole purpose." We will affirm the judgment of the District Court.[2]

## I.

### *The Magnuson-Stevens Act*

---

[2] Before the District Court, the fishermen raised several additional contentions: (1) that the loss of the use of the "unique fishing gear" that they had purchased for the scallop harvest constituted an unconstitutional taking; (2) that Amendment 11 violated National Standard 3 by placing the Northern Gulf of Maine (NGOM) fishery under a separate management scheme; and (3) that Amendment 11 violated National Standard 4 by allocating a higher catch limit to NGOM permit holders than to incidental catch permit holders. Judge Cooper ably addressed these issues in her opinion, and they are not being pressed by the scallop fishermen on appeal. *See Gen. Category Scallop Fishermen v. Sec'y of U.S. Dep't of Commerce*, 720 F. Supp. 2d 564 (D.N.J. 2010).

The Magnuson-Stevens Act, as amended by Congress in 1990 and 1996, delegates to NMFS, by and through the Secretary of Commerce, the authority to implement a comprehensive national fisheries management program in order "to prevent overfishing, to rebuild overfished stocks, to insure conservation, to facilitate long-term protection of essential fish habitats, and to realize the full potential of the Nation's fishery resources." *See* 16 U.S.C. § 1801(a)(6).[3] The Secretary's authority is exercised through eight Regional Fishery Management Councils composed of state fishery managers, the regional NMFS fisheries administrator, and representatives of the fishing, environmental, and academic communities. The Councils are responsible for preparing FMPs and recommending implementing regulations for the Exclusive Economic Zone that stretches 200 nautical miles seaward from the coastal

---

[3] Under the Magnuson-Stevens Act, a "fishery" is either "one or more stocks of fish that can be treated as a unit for purposes of conservation and management that are identified on the basis of geographic, scientific, technical, recreational, or economic characteristics, or method of catch," or "any fishing for such stocks." 50 C.F.R. § 600.10.

5

boundaries of the States within each region.[4]  The task of approving an FMP falls to the Secretary of Commerce, who is mandated to review the FMP to ensure that it complies with the ten "National Standards" established by the Magnuson-Stevens Act.[5] *See* 16 U.S.C. § 1851(a)(1) - (10). The Secretary must also publish the proposed FMP and accept public comment for a 60-day period before giving his or her final approval.  16 U.S.C. § 1854(a)(1)(B).  An implementing regulation goes through the same process of review, although the Secretary may limit the period for public comment to a minimum of 15 days.  16 U.S.C. § 1854(b)(1)(A).  NMFS is the executive agency responsible for overseeing the enforcement of an approved FMP and any of its attendant regulations.

---

[4] The Exclusive Economic Zone of the United States extends the full 200 nautical miles permitted under international law and treaty.  16 U.S.C. § 1802(11); *see Am. Pelagic Fishing Co., L.P. v. United States*, 379 F.3d 1363, 1366 (Fed. Cir. 2004).  A national state has sovereign rights over natural resources, living and nonliving, within its Exclusive Economic Zone.

[5] The Secretary has delegated his authority under the Magnuson-Stevens Act to promulgate regulations implementing FMPs and their Amendments to NMFS.

***The New England Fishery Management Council***
***and the Scallop Fishery***

The development of the Atlantic Sea Scallop FMP is the responsibility of the New England Fishery Management Council (NEFMC). All parties agree that the NEFMC is not an "agency" within the meaning of the APA. In 1994, the "limited access" scallop FMP then in place was amended (Amendment 4) to provide for an "open access" fishery to "allow a flexible program for seasonal or opportunistic fisheries targeting inshore scallops." Both "limited access" and "open access general category" scalloping permits authorized the harvest of up to 400 pounds of Atlantic sea scallops daily. Only large-scale scallop boats, however, were eligible for the "limited access" permits. Small-scale scallop fishing vessels and vessels that harvested scallops as an incidental bycatch were issued "general category" permits. The Appellants are small-scale general category scallop fishermen.

After the passage of Amendment 4, the number of general category permit holders exploded, fueling concerns

7

about overfishing.[6] These concerns prompted the NEFMC to consider regulatory responses to limit the number of participants in the general category scallop fishery. On August 31, 2004, the NEFMC published a "Notice of a Public Meeting" in the Federal Register announcing a three-day meeting to be held from September 14-16, 2004, in Fairhaven, Massachusetts, "to consider actions affecting New England fisheries in the exclusive economic zone." According to the meeting agenda, among the issues that "[might] be discussed" were "actions to address overfishing" and "actions to cap or reduce general category scallop landings and/or improve reporting measures."

---

[6] From 1994 to 2005, the number of general category permits increased from 1,992 to 2,950, and the number of general category vessels landing scallops more than tripled.

8

During the meeting, NEFMC Vice-Chairman Thomas Hill announced his intention "to propose a motion to establish a control date effective [upon] publication of the Federal Register . . . that would freeze the number of permits in the fishery."[7] One of the participants (Maggie Raymond of the Associated Fisheries of Maine) objected that the subject of a control date "was not posted on the agenda [and so] this would be the only opportunity for the public to speak to that." Hill replied that the NEFMC "never notifie[s] the public in advance," because it "defeats the purpose of the control date if you notify in advance." Hill's motion to publish notice of a control date for the general category permit scallop fishery was adopted by a 13-1 vote, with two abstentions.

NMFS published the notice in the Federal Register on November 1, 2004. In relevant part, the Advance Notice of Proposed Rulemaking (ANPR) sought public comment on:

---

[7] A control date "provides notice to anyone subsequently entering a fishery that he is not assured of continued participation in the fishery should a limited entry scheme be implemented." *Am. Pelagic Fishing Co.*, 379

9

F.3d at 1366 n.3.

proposed rulemaking to control future access to the open access vessel permit category (general category) Atlantic sea scallop fishery if a management regime is developed and implemented under [the Magnuson-Stevens Act] to limit the number of participants in this sector of the scallop fishery. . . . This announcement is intended, in part, to promote awareness of potential eligibility criteria for future access so as to discourage speculative entry into the fishery while the [NEFMC] considers whether and how access to the general category sea scallop fishery could be controlled. The date of publication of this notice, November 1, 2004, shall be known as the "control date" and may be used for establishing eligibility criteria for determining levels of future access to the sea scallop fishery subject to Federal authority.

69 Fed. Reg. 63341.

### *Amendment 11*

In January of 2006, the NEFMC initiated a "scoping" process inviting the fishing public to participate in the crafting of Amendment 11 to the Atlantic Sea Scallop FMP.[8] As announced, the purpose of Amendment 11 was to establish "criteria and authority for determining the

---

[8] "Scoping" is a term of administrative art that describes the process used by federal agencies to identify public concerns over the management of land and natural resources.

percentage of scallop catch allocated to the general category fleet" and to implement an Individual Fishing Quota (IFQ) permit system. Between February of 2006 and June of 2007, the NEFMC held 35 public meetings in seven states to discuss the adoption of Amendment 11. On April 11, 2007, the NEFMC submitted a Draft Supplemental Environmental Impact Statement to NMFS, the final version of which was submitted to NMFS on September 24, 2007. The NEFMC formally adopted Amendment 11 on June 20, 2007. On December 17, 2007, NMFS published Amendment 11 in the Federal Register with its proposed implementing regulations and invited public comment through January 31, 2008. On February 27, 2008, NMFS adopted Amendment 11 on behalf of the Secretary of Commerce. The final rule was published on April 14, 2008, and took effect on July 1, 2008.

Amendment 11 significantly reduced the number of vessels eligible to participate in the scallop harvest by replacing the open access general category fishery with a

"limited access general category" (LAGC). Amendment 11 provides for three classes of LAGC scalloping permits: (1) an IFQ permit; (2) a Northern Gulf of Maine permit; and (3) an incidental catch permit. At issue in this appeal is the IFQ permit, which allows a permittee to land up to 400 pounds of shucked scallop meat per trip.[9]

---

[9] A "trip" is defined as "the time period that begins when a fishing vessel departs from a dock . . . and that terminates with a return to a dock . . . ." 50 C.F.R. § 600.10.

To be eligible for an IFQ permit, NMFS records must confirm that the applicant vessel landed at least 1,000 pounds of scallop meat in any fishing year between March 1, 2001, and November 1, 2004. The vessel must also have been issued a general category scallop permit during the fishing year in which the qualifying landing was made. The individual quota is determined by a formula that weights the vessel's best year of scalloping and the number of years it has been actively engaged in scallop fishing. These numbers are derived from NMFS landings data compiled from dealer reports. A vessel owner may appeal the denial of a permit to NMFS, but only on the ground that the data NMFS relied on to determine eligibility was incorrect.[10]

---

[10] Once issued, an IFQ permit may be transferred from one scallop vessel to another with the approval of the NMFS Regional Administrator. No single vessel issued an IFQ permit may be allocated more than two percent of the total allowable IFQ catch, nor may any individual have an ownership interest in more than five percent of the catch allocated to the scallop fleet.

Amendment 11 also allocates the scallop harvest between the limited access fleet and the LAGC permit holders.[11] The estimated landings of scallops by boats with incidental catch permits are first subtracted from the projected annual scallop harvest. IFQ permit holders are then allocated five percent of the remaining catch, while almost all of the rest is apportioned to the limited access scallop fishery.[12] Most of the Appellant fishermen received their first general scallop permit after the control date of November 1, 2004; thus, they are not eligible to receive LAGC scallop permits. For all practical purposes, their scallop fishing days are over.

## II.

### *Standard of Review*

---

[11] The NGOM Scallop Management Area is not included in the total allowable catch as it is only an occasional scallop fishery with "unique characteristics." Appellants have dropped their challenge to the exclusion of the NGOM from the calculation of the total allowable catch.

[12] Half of one percent of the catch is given over to limited access vessels that also hold IFQ permits.

15

This Court has jurisdiction to review the District Court's order pursuant to 28 U.S.C. § 1291. We review the District Court's grant of summary judgment de novo and apply a deferential standard in reviewing actions taken by NMFS on behalf of the Secretary, particularly those that fall within NMFS's special expertise.[13] *See Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 377-378 (1989); *Cyberworld Enter. Techs., Inc. v. Napolitano*, 602 F.3d 189, 195-196 (3d Cir. 2010). We may set aside the Secretary's action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or taken "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A)-(D).

Although this Court may not substitute its judgment for that of the Secretary, we may "consider whether the [Secretary's] decision was based on a consideration of the

---

[13] The Magnuson-Stevens Act specifically directs courts to look to the APA when reviewing an FMP implementation action taken by the Secretary. *See* 16 U.S.C. §§ 1855(f)(1) and (2). An implementing regulation of an FMP may only be set aside on the grounds specified in 5 U.S.C. §§ 706(2)(A)-(D).

relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). The scope of review, however, is narrow – we must presume the validity of the Secretary's decision. *Id.* at 415. "The Secretary's assessment of which fishery conservation and management measures would be in the nation's best interest is 'a classic example of a factual dispute the resolution of which implicates substantial agency expertise.'" *Ace Lobster Co., Inc. v. Evans*, 165 F. Supp. 2d 148, 165 (D.R.I. 2001) (quoting *Nat'l Fisheries Inst., Inc. v. Mosbacher*, 732 F. Supp. 210, 223 (D.D.C. 1990)).

### III.

### *Issue 1: The November 1, 2004 Control Date*

The principal argument made by the Appellant fishermen is that the District Court erred in determining that the NEFMC's "control date" recommendation was not subject to the rulemaking provisions of the APA.[14] They

---

[14] The scallop fishermen contend that the passage of a control date constitutes a rule under the APA because it is a

reason that because NOAA and NMFS are agencies that must answer to the notice and comment requirements of the APA and the Magnuson-Stevens Act, the NEFMC by extension is governed by the same constraints.[15] Operating from this premise, the fishermen find fault with almost every step taken by the NEFMC in developing the control date proposal. First, they object to the fact that notice of the September 14-16, 2004 meeting was published in the Federal Register "only" 14 days in advance. Second, they claim that the published agenda failed to make specific mention of the possible adoption of a control date. Third, the fishermen argue that Vice-Chairman Hill ambushed them by bringing the motion to establish a control date to a

---

"whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4).

[15] The fishermen concede – as they must – that the NEFMC is not itself an "agency" falling directly under the rulemaking requirements of the APA. *See J.H. Miles & Co., Inc. v. Brown*, 910 F. Supp. 1138, 1159 (E.D. Va. 1995) (determining that the Mid-Atlantic Fishery Management Council is not an "agency" within the meaning of the APA).

snap vote, depriving them of a meaningful opportunity to mobilize in opposition.[16]

The fishermen also object to the selection of November 1, 2004, as the control date. They contend that the NEFMC "arbitrarily and capriciously let the specific control date be determined by publication in the Federal Register . . . by some unknown individual" rather than by the NEFMC members themselves. They further argue that the publication of the control date in the Federal Register did not amount to "wide publicity in the major fishing ports of the region" as 16 U.S.C. § 1852(i)(2)(c) requires. Finally, the fishermen contend that the NEFMC foreclosed all meaningful opportunity for public comment by requiring that all written comments on the "proposed rule" be submitted by December 1, 2004, only one month after its publication in the Federal Register.

The flaw in the fishermen's argument is found in its

---

[16] The scallop fishermen allege that the NEFMC acted in violation of the notice and comment provisions of 5 U.S.C. §§ 553(b)(1) and (3); 16 U.S.C. §§ 1852(h)(3), 1852(i)(2)(c); Exec. Order No. 12866, § 6(a)(1), 50 C.F.R. § 600.135(a).

19

fundamental premise – that the publication by NMFS of the NEFMC's proposed November 1, 2004 control date promulgated a rule. In fact, the control date did not become a rule until NMFS adopted Amendment 11 on February 27, 2008. The November 1, 2004 ANPR's title and content made clear that the control date was a proposed rule and nothing more.

> This notification established November 1, 2004, as the control date for potential use in determining historical or traditional participation in the general category scallop fishery. Consideration of a control date does not commit the Council or NMFS to develop any particular management system or criteria for participation in this fishery. The Council may choose a different control date, or may choose a management program that does not make use of such a date.

69 Fed. Reg. at 63342. Indeed, if the November 1, 2004 publication of the control date by NMFS were a rule, the fishermen's action would be time-barred by the Magnuson-Stevens Act's statute of limitations, which requires that a petition for review of a final rule be filed within 30 days of

20

its publication.[17] *See* 16 U.S.C. § 1855 (f)(1).

We also agree with the District Court that NMFS reasonably concluded that the steps taken by the NEFMC in developing Amendment 11 complied with the procedural requirements of the Magnuson-Stevens Act. *See* 16 U.S.C. § 1854(a)(1). The NEFMC gave timely public notice of the September 2004 meeting by publishing the date 14 days in advance as the Magnuson-Stevens Act required. *Id.* § 1852(i)(2)(c). The meeting was announced in the Federal Register and in various fishing publications distributed in

---

[17] We are not without sympathy for the fishermen's response to the double bind in which they find themselves: "Appellees want flexible rulemaking by passing substantive rules and setting them aside for years only later incorporating them into another rule. In the alternative, they want that the control date is a rule, but then argue the Fishermen are time-barred." However, the relief they seek – the retroactive application of the rulemaking requirements of the APA to the actions of the NEFMC in developing Amendment 11 – is beyond the competence of this Court to grant. *See Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 524 (1978) ("[T]he [APA] established the maximum procedural requirements which Congress was willing to have the courts impose upon agencies in conducting rulemaking procedures. Agencies are free to grant additional procedural rights in the exercise of their discretion, but reviewing courts are generally not free to impose them if the agencies have not chosen to grant them.") (footnote omitted).

the New England and Mid-Atlantic regions, including two with combined circulations in the tens of thousands – *Commercial Fisheries News* and *National Fisherman*. The notice of the meeting was also posted on the NMFS website. The success of the notice effort is demonstrated by the fact that over 70 stakeholders attended the meeting.

We are also of the view that the November 1, 2004 publication of the proposed control date by NMFS came reasonably close on the heels of the NEFMC vote. As Appellees note, this publication was followed by a series of notices and public hearings tracking the shaping of Amendment 11 over the next three years. These hearings culminated in the November and December of 2007 publication by NMFS of the final rule and the implementing regulations and yet another round of public comment.[18]

The fishermen object more substantively to the fact that the NEFMC meeting discussed a control date at all, contending that the discussion and vote deviated from §

---

[18] According to Appellees, at least four of the Appellant fishermen submitted written comments expressing opposition to the November 1, 2004 control date.

1852(i)(2)(c) of the Magnuson-Stevens Act, which provides that "[t]he published agenda of the [regular] meeting may not be modified to include additional matters for Council action without public notice or within 14 days prior to the meeting date."  Although the use of the specific term "control date" in the proposed agenda might have been preferable, the agenda referred to "actions to address overfishing" as well as "actions to cap or reduce general category scallop landings."  We think this sufficient to have put the fishermen on notice that a control date might well be one of the mechanisms put forward at the meeting for reducing access to the scallop fishery.

*Issue 2: Mandate to Hold Public Meetings in All Geographic Areas*

The fishermen next argue that the District Court erred in concluding that the NEFMC complied "at least minimally" with the mandate that public meetings to discuss new management measures like Amendment 11 be held in "appropriate locations in the geographical area concerned." The locations also include areas under the authority of

another Council if the measures could "affect fishermen of that area." 16 U.S.C. § 1852(h)(3). Following the publication of the November 1, 2004 ANPR, 35 public meetings were held over a span of 18 months in Maine, New Hampshire, Massachusetts, Rhode Island, Connecticut, New Jersey, and Virginia. While it is true, as the fishermen complain, that most of the meetings were held in the New England region, that fact by itself is unsurprising, given that Georges Bank is the most sensitive of the environs of fishable Atlantic sea scallops.[19] Three public meetings were held outside of the jurisdiction of the NEFMC. Two of these were held in New Jersey. The first meeting in February of 2006 in Cape May attracted 150 participants. A second New Jersey meeting held in May of 2007 in Manahawkin drew another 30 fishermen. Later that month, a third meeting in Newport News, Virginia, attracted some 25 participants.

We can find no authority that supports the

---

[19] *See* Dvora Hart, *Status of Fishery Resources off the Northeastern U.S.*, NOAA (Dec. 2006), http://www.nefsc.noaa.gov/sos/spsyn/iv/scallop/.

24

fishermen's assertion that NMFS was required to hold at least one public meeting in every State comprising the New England and the Mid-Atlantic regions, including Delaware, Pennsylvania, Maryland and North Carolina. The Magnuson-Stevens Act requires that public meetings "shall" occur "at appropriate times and in appropriate locations in the geographical area concerned, so as to allow all interested persons an opportunity to be heard in the development of fishery management plans and amendments to such plans, . . . ." 16 U.S.C. § 1852(h)(3). Other than providing extraneous dictionary definitions explaining that "shall" is a word of affirmative command, the fishermen point to no statute or regulation that required the NEFMC to convene a meeting in every port of call on the Atlantic seaboard. More meetings might have been held, but that is not to say that the 35 that were held failed to satisfy § 1852(h)(3).

### *Issue 3: National Standard 2*

The fishermen next complain that the District Court erred in finding that NMFS's decision to rely on dealer reports contained in its own database to calculate historical

25

scallop landings complied with National Standard 2.[20] The fishermen contend that the NMFS database is "flawed" and that NMFS acted unreasonably in refusing to correct errors in the compiled dealer reports by cross-checking the NMFS data against the fishermen's self-reported Vessel Trip Reports (VTR) and the dealers' own datasets.

Under the Magnuson-Stevens Act, FMPs must "contain the conservation and management measures . . . which are . . . consistent with the national standards, the other provisions of this chapter, . . . and any other applicable law." 16 U.S.C. § 1853(a)(1)( C). National Standard 2 stipulates that "[c]onservation and management measures shall be based upon the best scientific information available." 16 U.S.C. § 1851(a)(2). In deciding whether scientific information is the "best available," substantial deference is accorded to the Secretary's assessment of the

---

[20] As will be recalled, to be eligible for a LAGC permit, Amendment 11 requires an applicant to have landed at least 1,000 pounds of shucked scallop meat during at least one fishing year between March 1, 2000, and November 2, 2004. The fishermen do not challenge the eligibility criteria, but rather the data used to calculate a fisherman's

quality of what is available. *See Washington Crab Producers, Inc. v. Mosbacher*, 924 F.2d 1438, 1448-1449 (9th Cir. 1990). *See also C & W Fish Co., Inc. v. Fox*, 931 F.2d 1556, 1652 (D.C. Cir. 1991) (a court's task on review is simply "to determine whether the Secretary's conclusion that the standards have been satisfied is rational and supported by the record.").

We discern no error in the District Court's determination that the decision "to utilize NMFS landings data from dealer reports to determine whether a vessel met the 1,000-pound landings criterion" did not contravene National Standard 2. "It is well settled . . . that the Secretary can act when the available science is incomplete or imperfect, even where concerns have been raised about the accuracy of the methods or models employed." *North Carolina Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp. 2d 62, 85 (D.D.C. 2007). During the development of Amendment 11, NMFS and the NEFMC recognized that flaws existed in all of the available data groups, but

yearly scallop catch.

concluded that there were no practical or cost-effective means of correcting the "many errors in both VTR and dealer datasets."

To address errors or omissions in the NMFS data, the framers of Amendment 11 adopted a suggestion made by a public meeting participant that "a full appeals process" be provided through which fishermen who were denied LAGC permits could challenge the denial "on the grounds that the information used by the Regional Administrator was incorrect." 73 Fed. Reg. at 20092. The appeals process allows a rejected applicant to continue fishing pending the outcome of the appeal to prevent any prejudicial delay. As the District Court aptly observed, Amendment 11 does not preclude the use of data the fishermen consider superior – rather, it allows for its full consideration at an adversarial hearing.

### *Issue 4: National Standard 5*

The fishermen's final objection is to the District Court's finding that the Secretary took sufficient account of non-economic objectives in implementing Amendment 11.

National Standard 5 requires that "[c]onservation and management measures shall, where practicable, consider efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as its sole purpose." 16 U.S.C. § 1851(a)(5). The fishermen argue that "Amendment 11 is only an economic re-allocation of the scallop resource among competing stakeholders." To prevail on this claim, the fishermen are required to show that the Secretary failed to consider *any* non-economic objectives in promulgating Amendment 11. *See Alaska Factory Trawler Ass'n v. Baldridge*, 831 F.2d 1456, 1460 (9th Cir. 1987).

That Amendment 11 had economic consequences is undeniable. That it took into account "biological, ecological, and social objectives" as well is readily apparent from the record. *See* 50 C.F.R. § 600.330(e). As NMFS explained, the motivating force in the development of Amendment 11 was the control of mortality in the general category fishery and that economic considerations were secondary. "Amendment 11 recognizes that, without

29

controls on the number of participants, the general category fleet can expand, especially when the resource conditions are very good[,] . . . [which] could contribute to overfishing if combined with the full utilization of limited access effort." 73 Fed. Reg. at 20098.[21] There is ample evidence in the record to support the District Court's determination that National Standard 5 was met.

## IV.

For the reasons stated, we will affirm the judgment of the District Court.

---

[21] Amendment 11's Final Supplemental Environmental Impact Statement spells out that "[e]conomic allocation is not the sole purpose of this action: the measures are primarily intended to control mortality in the general category fishing and do so in the most equitable and efficient way possible while maintaining the historical character of the fishery."