**The FISHING RIGHTS ALLIANCE, INC., Kurt Theodore, an individual, and Jack Hexter, an individual, Plaintiffs,**

**v.**

**Penny PRITZKER, Secretary of Commerce, Eileen Sobeck, Assistant Administrator for Fisheries, National Oceanic and Atmospheric Administration, National Marine Fisheries Service, National Marine Fisheries Service, Roy Crabtree, Ph.D, Regional Administrator for the National Marine Fisheries Service, Southeast Region, and Charter Fishermans Association, Defendants.**

**Case No: 8:15–cv–1254–MSS–MAP**

United States District Court,
M.D. Florida,
TAMPA DIVISION.

Signed 03/30/2017

Craig L. Berman, Berman Law Firm, PA, St Petersburg, FL, for Plaintiffs.

Mark Arthur Brown, US Department of Justice—ENRD, Washington, DC, Adam Babich, Tulane Environmental Law Clinic, New Orleans, LA, Justin Bloom, Justin Bloom, Attorney at Law, Sarasota, FL, for Defendants.

## ORDER

MARY S. SCRIVEN, UNITED STATES DISTRICT JUDGE

**THIS CAUSE** comes before the Court for consideration of Plaintiffs' Motion for Summary Judgment Against the Federal Defendants, (Dkt. 21), Defendants' Response in opposition thereto, (Dkt. 34), Plaintiffs' Reply in support of their Motion, (Dkt. 36), Defendants' Cross–Motion for Summary Judgment, (Dkt. 33), Plaintiffs' Response in opposition thereto, (Dkt. 36), Defendants' Reply in Support of their

Motion, (Dkt. 43), the Amicus Curiae Brief Filed on Behalf of Ocean Conservancy and Environmental Defense Fund in Support of Defendants' Motion for Summary Judgment, (Dkt. 46), and the Amicus Curiae Brief filed by the Charter Fisherman's Association in opposition to Plaintiffs' Motion for Summary Judgment. (Dkt. 47) Upon consideration of all relevant filings, case law, and being otherwise fully advised, the Court **DENIES** Plaintiffs' Motion for Summary Judgment and **GRANTS** Defendants' Motion for Summary Judgment.

## I. STATUTORY AND REGULATORY FRAMEWORK

This case concerns the regulation of the red snapper fishery in the Gulf of Mexico under the Magnuson–Stevens Fishery Conservation and Management Act ("MSA" or "Act"), 16 U.S.C. §§ 1801 et seq. Congress promulgated the MSA with the goal of conserving and protecting the fishery resources in the federal waters of the United States Exclusive Economic Zone ("EEZ"), the area that extends 200 nautical miles from the seaward boundary of each of the coastal states. (AR 16365) The Act established eight (8) Regional Fishery Management Councils with authority over the fisheries within the bodies of water bordering each region. 16 U.S.C. § 1852(a). The Councils are tasked with developing fishery management plans ("FMPs") containing management and conservation measures for the fisheries within the designated region. Every FMP must be "necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery." 16 U.S.C. § 1853. Relevant to the instant case, the Gulf of Mexico Fishery Management Council ("Gulf Council"), which consists of the States of Texas, Louisiana, Mississippi,

Alabama and Florida, is empowered to prepare FMPs concerning the fisheries in the Gulf of Mexico. 16 U.S.C. § 1852(a)(1)(E).

The members of the Gulf Council must vote to adopt an FMP or an amendment to an FMP, after which time, the FMP is submitted to the Secretary of Commerce for approval. 16 U.S.C. § 1852(e)(1), (h)(1). The Secretary of Commerce, through a delegation of authority, acts through the National Marine Fisheries Service ("NMFS"). Gulf Fishermen's Ass'n v. Gutierrez, 529 F.3d 1321, 1322 (11th Cir. 2008). NMFS reviews the plan or amendment and publishes it in the Federal Register for public comment for a 60–day period, after which time NMFS shall approve, disapprove, or partially approve the plan or amendment. 16 U.S.C. § 1854. Once NMFS approves an FMP or amendment to an FMP, it is implemented as a regulation in the Federal Register and has the force of law.

FMPs must be consistent with ten National Standards provided in the MSA. 16 U.S.C. § 1851. The following three National Standards are pertinent to this case:

(4) Conservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges. (5) Conservation and management measures shall, where practicable, consider efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as its sole purpose.

(10) Conservation and management measures shall, to the extent practicable, promote the safety of human life at sea.

Furthermore, the MSA contains a provision that specifically addresses the Gulf Council's governing of the red snapper fishery. Section 407(d) of the MSA, entitled "Catch Limits" provides:

Any fishery management plan, plan amendment, or regulation submitted by the Gulf Council for the red snapper fishery after October 11, 1996, shall contain conservation and management measures that—

(1) establish separate quotas for recreational fishing (which, for the purposes of this subsection shall include charter fishing) and commercial fishing that, when reached, result in a prohibition on the retention of fish caught during recreational fishing and commercial fishing, respectively, for the remainder of the fishing year; and

(2) ensure that such quotas reflect allocations among such sectors and do not reflect any harvests in excess of such allocations.

16 U.S.C. § 1883(d). As such, the red snapper quota must be divided between the recreational and commercial sectors.

## II. FACTUAL BACKGROUND

### A. History of the Management of the Red Snapper Fishery in the Gulf of Mexico

In November 1984, the Secretary implemented the Reef Fish FMP, the fishery management plan governing the red snapper fishery in the Gulf of Mexico. Original Fishery Management Plan for the Reef Fish Fishery of the Gulf of Mexico, 49 Fed. Reg. 39,548 (Oct. 9, 1984). In 1990, the Gulf Council determined that the red snapper population was "severely overfished" and began efforts to rebuild the red snapper stock. Amendment 1 to the Reef Fish FMP, 55 Fed. Reg. 2,078 (Jan. 22, 1990); see also 16 U.S.C. § 1854 (requiring Regional Councils to prepare and implement an FMP or amendment to an FMP "to end overfishing immediately in the fishery and to rebuild affected stocks of fish" upon awareness that a fishery is overfished). By 2005, the red snapper stock, still overfished, reflected a population of about seven percent of its historic abundance. Coastal Conservation Ass'n v. Gutierrez, 512 F.Supp.2d 896, 898 (S.D. Tex. 2007) (citing Amendment 22 to the Reef Fish FMP).

Over time and through the implementation of various conservation and management measures, the red snapper stock began to recover, allowing for an increased quota for both the commercial sector and the recreational sector of the red snapper fishery. (AR 16276, 16328) Nonetheless, the recreational sector, which is managed under a quota, bag and size limits, and closed seasons has consistently exceeded its allotted quota every year except two from 1997 to 2013.[1] (AR 16332) In 2014, a federal district court required NMFS to implement further accountability measures within the recreational sector to reduce overfishing. Guindon v. Pritzker, 31 F.Supp.3d 169, 197 (D.D.C. 2014) (citing 16 U.S.C. § 1853(a)(15)).

One measure historically implemented to help the rebuilding effort in the red snapper fishery is the shortening of the recreational sector's season. (AR 16348) For example, in 2008, the federal red snapper recreational season length was reduced from 194 days to 65 days. (AR 16330) In 2014, prompted by the Guindon decision, NMFS implemented an emergency rule that reduced the federal season to only 9 days. (AR 16390) However, the fed-

---

1. The recreational quota was not exceeded in 2006, the year following Hurricane Katrina, and in 2010, the year of the Deepwater Horizon oil spill. (AR 16331)

eral season length reduction has been counteracted by non-conforming state regulations allowing for substantially longer seasons for red snapper fishing. For instance, in 2014, while the federal season was nine days long, Texas waters were open for a total of 365 days, Louisiana for 286 days, Florida for 52 days, and Mississippi and Alabama for 21 days. (AR 16277) NMFS must take into account the amount of red snapper stock harvested in state waters when determining when the recreational quota is reached, see 50 C.F.R. § 622.8(a). Thus, "when states adopt inconsistent, less restrictive regulations for state waters[,] the length of the federal recreational red snapper season must be shortened to account for increased landings from state waters." (AR 16321) For example, in 2014, since "over half of the recreational quota was projected to be caught outside of the federal season in 2014[,] the remaining recreational quota only allowed for a nine-day season to be set." (AR 16322)

The impact of the inconsistent federal and state seasons is felt most by federally permitted for-hire vessels. For-hire vessels are charter vessels and headboats [2] on which anglers pay operators to be taken on a fishing trip. (AR 16276) Federal for-hire vessels' red snapper fishing opportunities are limited to those provided under federal law because such vessels are not permitted to fish for red snapper in state waters during the state season. (AR 16371); see 74 Fed. Reg. 17,603 (Apr. 16, 2009); 50 C.F.R. § 622.20(b)(3). In contrast, recreational private anglers enjoy both federal and state waters access during their respective seasons. (AR 16371) Additionally, because there has been a moratorium on the issuance of new federal reef fish for-hire permits since 2004, fishing access in federal waters by non-boat-owning anglers is limited. (AR 16288, 16294)

Currently, due to the progress made through various measures of the Gulf Council, overfishing is no longer occurring in the red snapper fishery. (AR 16338, 16340) While this reflects undeniable progress, the red snapper stock remains overfished. [3] (Id.) Thus, the Gulf Council continues to work toward rebuilding the stock. (AR 16403)

### B. Amendment 40

On April 22, 2015, the Secretary, through NMFS, implemented Amendment 40 to the Reef Fish FMP, which affects only the recreational sector of the red snapper fishery. Amendment 40 to the Reef Fish FMP, 80 Fed. Reg. 22,422 (Apr. 22, 2015). Amendment 40 makes three essential changes to the status quo of the recreational sector. First, it partitions the recreational sector into two components: (1) the federal for-hire component, which consists of vessels that have been issued a valid Federal charter vessel/headboat permit for Gulf reef fish, and (2) the private angling component, which consists of privately-owned vessels without a federal permit. Id. at 22430. Second, the Amendment allocates the recreational sector's quota between the two components: the for-hire component is allocated 42.3% of the quota and the private angling component is allocated 57.7% of the quota. Id. Third, Amendment 40 determines the season

---

[2]. Headboats are so denominated because anglers are charged by the person or by head count. (AR 16276)

[3]. "A stock is considered 'overfished' when its biomass has declined below a level that jeopardizes the capacity of the stock to produce [Maximum Sustainable Yield] on a continuing basis. 50 C.F.R. § 600.310(e)(2)(i)(E). Because it takes time for biomass levels to recover, a stock may be designated as 'overfished' even when 'overfishing' is not currently taking place. The Gulf of Mexico red snapper stock fits that description." Guindon, 31 F.Supp.3d at 179 n.3.

length for each component based upon each component's annual catch target ("ACT"),[4] which results in disparate season lengths for each component. Id. The stated purpose of the amendment is "to provide a basis for increased flexibility in future management of the recreational sector, and reduce the likelihood of recreational quota overruns, which could negatively impact the rebuilding of the red snapper stock." Id. at 22422.

Plaintiffs in this case are two private recreational anglers and a marine conservation group. (Dkt. 1 at ¶¶ 6–7) Defendants are the Secretary of Commerce, the Assistant Administrator for Fisheries, NOAA, NMFS, and the Regional Administrator for the Southeast Region of NMFS. Plaintiffs allege that Amendment 40 is unlawful because it violates Section 407(d) of the MSA and National Standards 4, 5, and 10. Both Parties have filed motions for summary judgment.

## III. LEGAL STANDARD

### A. Summary Judgment

▮ Ordinarily, summary judgment is appropriate when the movant can show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Fennell v. Gilstrap, 559 F.3d 1212, 1216 (11th Cir. 2009) (citing Welding Servs., Inc. v. Forman, 509 F.3d 1351, 1356 (11th Cir. 2007)). In cases involving judicial review of agency action, however, the district court acts as an appellate tribunal and "'the entire case on review is a question of law.'" Brinklys v. Johnson, 175 F.Supp.3d 1338, 1349 (M.D. Fla. 2016) (quoting Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1083 (D.C.Cir. 2001)). In such cases,

"'[s]ummary judgment is the mechanism for deciding whether as a matter of law the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review.'" Id. at 1350 (quoting CS–360, LLC v. U.S. Dep't of Veterans Affairs, 101 F.Supp.3d 29, 32 (D.D.C. 2015)). Thus, "the court does not look at whether there is a genuine issue of material fact, but instead turns directly to the question of the validity of the challenge." Malladi v. Brown, 987 F.Supp. 893, 922 (M.D. Ala. 1997), aff'd sub nom. United States v. Ponder, 150 F.3d 1197 (11th Cir. 1998) (citing Good Samaritan Hosp., Corvallis v. Mathews, 609 F.2d 949, 951 (9th Cir.1979)).

### B. Administrative Procedures Act

Challenges to actions made pursuant to the MSA are subject to review under the APA, 5 U.S.C. § 706(2). See 16 U.S.C. § 1855; Gutierrez, 529 F.3d at 1323. The APA provides judicial authority to review executive agency action for procedural correctness. F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 513, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009) (citing Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. 519, 545–49, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978)). Accordingly, an agency action will be upheld unless it is arbitrary or capricious, an abuse of discretion, contrary to law, or without observance of procedure required by law. 5 U.S.C. § 706(2). The Eleventh Circuit has held that:

A decision is arbitrary and capricious "where the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered

---

4. "An ACT is an amount of annual catch of a stock or stock complex that is the management target of the fishery, and accounts for management uncertainty in controlling the catch at or below the [annual catch limit]."

50 C.F.R. § 600.310(i)(4). The ACT is reduced from the quota by twenty percent, which reduces the chance the quota will be exceeded. (AR 16294, 16318); see 50 C.F.R. § 622.41(q)(2).

an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Nat'l Parks Conservation Ass'n v. U.S. Dep't of the Interior, 835 F.3d 1377, 1383–84 (11th Cir. 2016) (quoting Defenders of Wildlife v. United States Dep't of the Navy, 733 F.3d 1106, 1115 (11th Cir. 2013)). "This standard is exceedingly deferential. The court's role is to ensure that the agency came to a rational conclusion, not to conduct its own investigation and substitute its own judgment for the administrative agency's decision." Sierra Club v. Van Antwerp, 526 F.3d 1353, 1360 (11th Cir. 2008) (quotations and citations omitted).

 "Judicial review of agency action under the MSA is especially deferential." N.C. Fisheries Ass'n, Inc. v. Gutierrez, 518 F.Supp.2d 62, 79 (D.D.C. 2007) (citing Alliance Against IFQs v. Brown, 84 F.3d 343, 345 (9th Cir.1996)). A challenge to an FMP amendment as violative of a National Standard is not reviewed de novo. Id. Instead, the Court must "determine whether the Secretary's conclusion that the standards have been satisfied is rational and supported by the record." C & W Fish Co., Inc. v. Fox, 931 F.2d 1556, 1562 (D.C. Cir.1991)). That is to say, the Agency's action cannot be undone unless the Court finds it to be arbitrary and capricious or otherwise not in accordance with law. The Court "may not substitute its judgment for the NMFS' expertise, nor may it substitute an objecting party's preferences for that of the agency." Ocean Conservancy v. Evans, 260 F.Supp.2d 1162, 1169 (M.D. Fla. 2003) (citation omitted). Under this very deferential standard of review of the agency's action, the Court is constrained to uphold the challenged FMP amendment 40 at issue in this case.

## IV. DISCUSSION

### A. Section 407(d) of the MSA and National Standard 10

In Count I of their Complaint, Plaintiffs allege that Amendment 40 creates a "new fishing sector" for for-hire vessels in violation of Section 407(d) of the MSA. (Dkt. 1 at ¶¶ 25–30) In Count IV, Plaintiffs allege that the Amendment violates National Standard 10 because it shortens the fishing season for the private angling component, which will cause private anglers to take unnecessary risks should foul weather or high-winds present arise during the shortened season. (Id. at ¶¶ 43–45) However, the Court finds that Plaintiffs have abandoned these claims as they were not raised in Plaintiffs' Motion.

 It is well settled in this Circuit that a district court may treat as abandoned a claim alleged in a complaint but not raised or argued in a motion for summary judgment. Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995); Rd. Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp., 10 F.3d 1563, 1568 (11th Cir. 1994) (finding that a district court "could properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment.") Here, Plaintiffs fail to raise the alleged violations of Section 407(d) and National Standard 10 in their Motion for Summary Judgment. (See Dkt. 21) Moreover, Plaintiffs make no mention of either claim in their Reply even in the face of Defendants' express argument that the claims should be considered abandoned. (Dkt. 33–1 at 35; Dkt. 35) In fact, in their Motion Plaintiffs repeatedly refer to the new components in the recreational sector as a "sub-sectors," apparently conceding away the argument that Amendment 40's partition of the recreational sector effectively creates "a new sector" and thus violates Section 407(d). (Dkt. 21 at 3,

13, 17). This contention was summarily rejected in any event in <u>Coastal Conservation Association v. United States Department of Commerce</u>, 846 F.3d 99, 106 (5th Cir. 2017) ("Amendment 40 does not in fact create a 'separate' charter fishing quota. Rather, it creates a *sub*-quota for charter fishing within the recreational sector.") (emphasis in original) (citations omitted). Thus, the Court deems Plaintiffs' Count I, Violation of Section 407(d) of MSA, and Count IV, Violation of National Standard 10 abandoned.

## B. National Standard 4

Plaintiffs contend that Amendment 40 violates National Standard 4 does not treat all fishermen fairly and equitably. According to National Standard 4,

> Conservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.

16 U.S.C. § 1851(4).

The implementing regulations for National Standard 4 explicitly recognize, however, that "[i]nherent in an allocation is the advantaging of one group to the detriment of another." 50 C.F.R. § 600.325 (c)(3)(i)(A). So long as the motive behind resulting disadvantage to one group can "be justified in terms of the objectives of the FMP," the discriminatory impact will not be fatal to the FMP. <u>Id.</u> The regulations explain:

> An allocation of fishing privileges may impose a hardship on one group if it is outweighed by the total benefits received by another group or groups. An allocation need not preserve the status quo in the fishery to qualify as "fair and equitable," if a restructuring of fishing privileges would maximize overall benefits. The Council should make an initial estimate of the relative benefits and hardships imposed by the allocation, and compare its consequences with those of alternative allocation schemes, including the status quo.

50 C.F.R. § 600.325 (c)(3)(i)(B).

■ Thus, "[c]ourts have declined to second-guess the Secretary's judgment simply because the provisions of a Fishery Management Plan or a plan allocation have a greater impact upon one group or type of fishermen." <u>Van Valin v. Locke</u>, 671 F.Supp.2d 1, 9 (D.D.C. 2009) (quotation marks and citations omitted). " '[T]he Secretary is allowed, under [National Standard Four], to sacrifice the interests of some groups of fishermen, for the benefit as the Secretary sees it of the fishery as a whole.' " <u>Id.</u> (quoting <u>Alliance Against IFQs v. Brown</u>, 84 F.3d 343, 350 (9th Cir. 1996)).

■ Plaintiffs argue that Amendment 40's quota allocation between the federal for-hire and the private angling components is unjustifiably inequitable. According to Plaintiffs, the Gulf Council erred in using historical data dating back 30 years to determine these allocations. (Dkt. 21 at 20; Dkt. 36 at 11). Further, because each component's quota allocation affects that component's season length, Plaintiffs complain that the federal for-hire component's season is unnecessarily too long. (Dkt. 21 at 21)

In <u>Coastal Conservation Association v. United States Department of Commerce</u>, the Eastern District of Louisiana directly addressed a substantially identical challenge to Amendment 40. No. CV 15-1300, 2016 WL 54911, at *7 (E.D. La. Jan. 5, 2016), <u>aff'd</u>, 846 F.3d 99 (5th Cir. 2017).

There, the plaintiffs argued that Amendment 40 impermissibly discriminates against recreational anglers without the requisite finding that the hardship to this group is outweighed by the total benefit to the red snapper fishery. Id. at *7. The court found that the allocation of the recreational quota between the federal for-hire component and the private angling component did not violate National Standard 4. Id. The court explained that "the detriment suffered by private anglers in the reduction of their federal season is offset by the fact that they may pursue snapper fishing opportunities in state waters," an opportunity not afforded to federal for-hire vessel owners. Id. It cited several benefits of sector separation outweighing the hardship on the private angling component considered by the Gulf Council to support its opinion. It noted that sector separation allows for "better management of the fishery by stabilizing the federal for-hire component's participation in the sector, increasing access of anglers who do not own vessels, creating a base for further management focused on maximizing opportunities for each component, reducing discard mortality, and reducing the likelihood or quota overages in the recreational sector." Id.

The district court also found that the Gulf Council's use of both historical and recent data to determine the allocation percentages between the two components was not arbitrary and capricious. Id. at *8. The court acknowledged that the Gulf Council considered eight alternative data ranges before settling on the preferred alternative. Id. It accepted the Gulf Council's rationale for rejecting an allocation based solely on recent years as such data " 'did not capture changes that have occurred in the fishery, such as changes in regulations and disruptive events such as hurricanes and oil spills that have affected how recreational fishing is prosecuted.' " Id. (quoting 80 Fed. Reg. at 22,429). Employing the district court's reasoning, the Fifth Circuit affirmed the decision. Coastal Conservation Ass'n, 846 F.3d 99, 110–11 (5th Cir. 2017).

The Court finds the reasoning of the Eastern District of Louisiana, which was upheld by the Fifth Circuit, to be sound and adopts that reasoning here. The Court finds therefore that the Secretary's allocation of the recreational quota between the for-hire and private angling components was rationally justified and was therefore not arbitrary and capricious.

Plaintiffs also contend that Amendment 40 violates National Standard 4 implementing regulation, 50 C.F.R. 600.325(c)(iii), which states that "[a]n allocation scheme must be designed to deter any person or other entity from acquiring an excessive share of fishing privileges, and to avoid creating conditions fostering inordinate control, by buyers or sellers, that would not otherwise exist." Amendment 40 conflicts with this regulation, according to Plaintiffs, because under the Amendment, "for-hire permit holders will be able to set higher charter process during red snapper season that will increase in length yearly as the stock biomass rebounds and the total allowable catch is increased." (Dkt. 21 at 18) As a result, private anglers will be forced to pay exorbitant prices to catch red snapper. (Id.) NMFS directly addressed this argument and found that substantial increases in price for for-hire trips as a result of Amendment 40 was not likely. It explained:

> For those anglers who choose to use for-hire services to fish in Federal waters, there is sufficient capacity in the for-hire fleet to prevent price control. As stated in Amendment 40, there are an estimated 1,269 charter vessels and 67 headboats operating in the Gulf with charter/headboat reef fish permits. The average number of red snapper target

trips in the charter mode is approximately 54,000 trips, or approximately 40 angler trips per charter vessel. Assuming 6 anglers per trip, the average number of vessel trips per charter vessel would be approximately 7 trips, equivalent to 7 days if full-day trips are taken, or fewer than 7 days if some trips are half-day trips. Similar information is not available for headboats because target information is not collected for these vessels. Although all of the charter vessels may not operate in areas where red snapper is available, these results show there is ample capacity to increase the number of for-hire trips without substantial price changes.

80 Fed. Reg 22427–28. The Court finds NMFS' determination to be rational. Hence, the Court does not find the Secretary's implementation of Amendment 40 to be arbitrary and capricious on this basis.

■■■ Plaintiffs further contend that the federal for-hire season should have only been 18 days long, rather than 44 days long in 2015 to counteract the inconsistent state seasons. (Dkt. 21 at 8) They base this argument on the Gulf Council's estimation that in 2014, the "[f]or hire season length would have been 18 days if all states adopted consistent fishing regulations." (AR 16323) Thus, according to Plaintiffs, if NMFS' concern in the red snapper fishery was the existence of inconsistent state seasons, it should have proposed an 18–day season for 2015 in the federal sector. Even if Plaintiffs' recommendation is a rational option, NMFS is not bound by it. Moreover, as noted above, the Court may not "substitute an objecting party's preferences for that of the agency." Evans, 260 F.Supp.2d at 1169. Instead, the Court must look to whether the alternative NMFS chose was arbitrary and capricious. Here, NMFS justifiably chose not to set express season lengths for the two components for any given year and not to rely solely on data from 2014. Instead, under Amendment 40, the length of each component's season is based on each component's ACT, which is reduced from that component's quota for the respective year. The Gulf Council determined that separate season lengths based the components' relative ACTs would, among other things, provide "more flexibility in managing these components." (AR 16325–26) As such, the Court finds that instituting season lengths based on each component's quota allocation was not arbitrary and capricious.

■■■ Plaintiffs also argue that Amendment 40 was covertly designed to set the stage for an individual fishing quota ("IFQ") program, whereby "each IFQ allocation holder is strictly monitored to ensure they do not land more than the pounds allocated to them" in the recreational sector. (Dkt. 21 at 19); (AR 16276) According to Plaintiffs, an IFQ program instituted for the federal for-hire component would violate 16 U.S.C. § 1853(14), which requires that recovery benefits within the overall harvest be allocated fairly and equitably among the commercial, recreational, and charter fishing sectors in the fishery. (Dkt. 21 at 15) Even if valid, this argument is not ripe for adjudication. Amendment 40 itself does not create an IFQ program in the recreational sector and thus, any challenge to such a program cannot be raised until a Rule implementing the program exists.

Finally, Plaintiffs argue that Amendment 40 is contrary to the plain language of National Standard 4 because it allocates the recreational quota to non-fishermen. According to Plaintiffs, National Standard 4 only allows for allocations among "United States fishermen." (Dkt. 36 at 8–10) Because charter vessel and headboat "operators" are not "fishermen," Plaintiffs assert, Amendment 40's quota allocation is unlawful. (Id.)

■■■ An agency's interpretation of a statute it is tasked with administering is

reviewed under the two-step analysis outlined in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Koch Foods, Inc. v. Sec'y, U.S. Dep't of Labor, 712 F.3d 476, 480 (11th Cir. 2013); see Glacier Fish Co. LLC v. Pritzker, 832 F.3d 1113, 1120 (9th Cir. 2016) ("We review NMFS's interpretation of the Magnuson-Stevens Act under the two-step framework of Chevron") (citations omitted). "Deference from the court is due if (1) Congress has not spoken directly on the precise question at issue and its intent is unclear, and (2) the agency's interpretation is based on a permissible construction of the statute." In re MDL–1824 Tri–State Water Rights Litig., 644 F.3d 1160, 1193 (11th Cir. 2011) (citing Chevron, 467 U.S. at 842–44, 104 S.Ct. 2778). The agency's interpretation "governs if it is a reasonable interpretation of the statute—not necessarily the only interpretation, nor even the interpretation deemed *most* reasonable by the courts." Entergy Corp. v. Riverkeeper, Inc., 556 U.S. 208, 129 S.Ct. 1498, 173 L.Ed.2d 369 (2009) (emphasis in original).

■ Plaintiffs contend that Amendment 40 is unlawful because it allocates quota to operators of charter vessels and headboats. (Dkt. 36 at 8–10) However, contrary to Plaintiffs' assertion, Amendment 40 does not allocate quota to "operators." Rather, pursuant to the plain language of the implemented regulation, the recreational quota is allocated between "*vessels* that have been issued a valid Federal charter vessel/headboat permit for Gulf reef fish any time during the fishing year" (for-hire component) and "*vessels* that fish under the bag limit and have not been issued a Federal charter vessel/headboat permit for the Gulf reef fish any time during the year" (private component). 50 C.F.R. § 622.39(B),(C) (emphasis added). Thus, the Court must consider whether an allocation of quota between *types of vessels* (which carry fishermen), contravenes National Standard 4, which allows for allocations "among various United States fishermen." 16 U.S.C. § 1851(4). Congress has not spoken directly on this issue. Thus, the Court must proceed with step two of the Chevron analysis and determine whether the Secretary's quota allocation to "vessels" is based on a permissible construction of the statute.

The implementing regulations for National Standard 4, which Plaintiffs do not challenge in this action, expressly permit this type of allocation.[5] In the section that defines "allocation," the implementing regulations state, in pertinent part, "Allocations of fishing privileges include, for example ... quotas by vessel class ...." 50 C.F.R. § 600.325(c)(1). As such, the Court finds that that a quota allocation between various vessel types does not conflict with National Standard 4.

### C. National Standard 5

Plaintiffs additionally argue that Amendment 40 is unlawful because it is not a conservation measure and the sole purpose of the Amendment is "economic allocation" in violation of National Standard 5. (Dkt. 21 at 9; Dkt. 36 at 6, 14) National Standard 5 provides that "[c]onservation and management measures shall, where practicable, consider efficiency in the utilization of fishery resources; except that no such measure shall have economic

---

**5.** Courts have found that "although the guidelines interpreting the MSA are not entitled to automatic Chevron deference because they do not carry the force of law, [they] are entitled to considerable deference in light of their thoroughness, the agency's expertise, and the administrative formalities involved in their promulgation." Guindon v. Pritzker, No. 1:15-CV-02256-BJR, 240 F.Supp.3d 181, 193–94, 2017 WL 875775, at *7 (D.D.C. Mar. 3, 2017) (citing Oceana Inc. v. Locke, 831 F.Supp.2d 95, 117 (D.D.C. 2011); Guindon v. Pritzker, 31 F.Supp.3d 169, 198 (D.D.C. 2014) (quotation marks omitted)).

allocation as its sole purpose." 16 U.S.C. § 1851 (5). An FMP will conflict with this Standard only if it "distribute[s] fishery resources among fishermen on the basis of economic factors alone, and [has] economic allocation as their only purpose." 50 C.F.R. § 600.330(e). "Where conservation and management measures are recommended that would change the economic structure of the industry or the economic conditions under which the industry operates, the need for such measures must be justified in light of the biological, ecological, and social objectives of the FMP, as well as the economic objectives." Id.

In determining whether an FMP violates National Standard 5, therefore, the Court must determine whether the Secretary "failed to consider *any* non-economic objectives." Gen. Category Scallop Fishermen v. Sec'y, U.S. Dep't of Commerce, 635 F.3d 106, 116 (3d Cir. 2011) (emphasis in original) (citing Alaska Factory Trawler Ass'n v. Baldridge, 831 F.2d 1456, 1460 (9th Cir.1987)). The question is not simply whether the provision may bestow some economic benefit upon some constituent fishermen within its purview.

Plaintiffs point to one of the stated goals of the Amendment to "[i]mprove economic conditions for the for-hire sector—primarily stability" as evidence that the Rule was promulgated only for economic allocation. (Dkt. 21 at 10) In response, Defendants contend that the Amendment does not violate National Standard 5 because, although stabilizing the federal for-hire component was one of the motives behind Amendment 40, it was not the only one. According to Defendants, "[i]n addition to providing economic benefits to the for-hire sector, NMFS reasonably concluded that separating the sectors

will increase access for those anglers who do not own a vessel [and] create a platform for future management that focuses on maximizing opportunities for each component, reducing discard mortality, and the likelihood of recreational quota overruns." (Dkt. 34 at 24)

The Court agrees. The record demonstrates the Secretary considered several non-economic objectives in promulgating Amendment 40. As noted in the Final Environmental Impact Statement, the purpose of Amendment 40 is to "provide a basis for flexible management approaches tailored to each component and reduce the likelihood for recreational quota overruns which could jeopardize the rebuilding of the red snapper stock." (AR 16309) As to the objective to reduce quota overruns, the Gulf Council estimated that through sector separation, "discards should decline as the number of fish caught should shift towards the federal for-hire component, which compared to the private angling component, has fewer discards." (AR 16279) The record supports this estimation as the relative number of discards between the charter boat and private angling components between 1981 and 2011 was 31% to 69%, respectively. (AR 16369) Moreover, the Gulf Council explained that "because of the limited number of federally permitted vessels and the fact that headboats regularly report landings, it is currently easier to both monitor and project landings of this component. Thus, the chances of the federal for-hire component exceeding its proposed quota and, by extension, the recreational sector quota, is reduced." (AR 16285–86) These objectives demonstrate a rational and not arbitrary conservation purpose underlying Amendment 40.[6] Additionally, the Gulf Council

6. Plaintiffs' reliance on Texas v. Crabtree, 948 F.Supp.2d 676 (2013), to support their assertion that Amendment 40 is not a conservation measure is misplaced. There, the Court invali-

dated an amendment to an FMP that set different federal season lengths for each State based on the length of each State's state sea-

found that Amendment 40 would support the objective to increase manageability of the recreational sector because sector separation would give the Council the ability "to tailor management measure to the characteristics of each component." (AR 16285) Further, the Gulf Council projected that Amendment 40 would help increase non-boat owning anglers' access to federal for-hire vessels, which has been limited due to the 2004 moratorium on federal for-hire permits and the concomitant shortened seasons afforded to the federal recreational sector. (AR 16280) Because the Secretary considered these non-economic objectives, Amendment 40 complies with National Standard 5.

### D. Section 1856(b) of the MSA

■ Plaintiffs raise an alternative argument in their Motion for Summary Judgment. Plaintiffs contend that under 16 U.S.C. § 1856(b), "Amendment 40 should be rejected because Defendants failed to invoke an available remedy to prevent extended state seasons." (Dkt. 21 at 27)

Section 1856(b) permits the Secretary to preemptively regulate state waters if, after giving the State notice and an opportunity for a hearing, the Secretary makes two findings. First, the Secretary must find that "[t]he fishing in a fishery that is covered by an FMP implemented under the Magnuson–Stevens Act is engaged in predominately within the EEZ and beyond such zone." Second, the Secretary must find that "[a] state has taken any action, or omitted to take any action, the results of which will substantially and adversely affect the carrying out of such FMP." 50 C.F.R. § 600.610(a)(1)–(2).

According to Plaintiffs, "[h]ad Defendants elected this remedy, it would have obviated the ostensible reason for Amendment 40 and prevent[ed] overruns." Id. But there is no requirement to choose this remedy in lieu of an FMP Amendment. Here, the administrative record supports the Secretary's decision to implement Amendment 40 as a measure to further the objectives of the Reef Fish FMP and to counteract the effects of inconsistent state seasons on for-hire vessel operators. That Plaintiffs disagree with the Secretary's decision does not form a basis for invalidation. Thus, the Court rejects this argument and finds that the Secretary's decision not to invoke 16 U.S.C. § 1856(b) was not arbitrary and capricious.

### V. CONCLUSION

Upon consideration of the foregoing, it is hereby **ORDERED** as follows:

1. Plaintiffs' Motion for Summary Judgment Against the Federal Defendants, (Dkt. 21), is **DENIED**.

2. Federal Defendants' Cross–Motion for Summary Judgment, (Dkt. 33), is **GRANTED**.

3. The Clerk is directed to enter **FINAL JUDGMENT** in favor of Defendants.

4. After entry of final judgment, the Clerk shall terminate any pending motions and **CLOSE** this case.

**DONE** and **ORDERED** in Tampa, Florida, this 30th day of March, 2017.

---

son. The court found that the amendment was not a conservation measure because "the only reason the Secretary adopted this rule was because [] states insisted upon setting different dates in their own waters." Id. at 690. In

contrast, here, NMFS rationally determined that Amendment 40 would serve several conservation objectives, including increasing manageability and reducing discard mortality and the likelihood of quota overages.